# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. <u>1:26-CV-3063</u>

BROCK WISNE,
AIDAN SHAW,
AISLIN MALCOLM,
CADE TYSON,
ABIGAIL JEFFERIES,
ANTHONY JOHNSON,
LOUIE JORDAN,
JEFFERSON DE LA CRUZ MONEGRO,
ISAIAH JONES,
DIMOND LOOSLI,
BRETT GRIFFITHS, and
JAKE MORELL on behalf of themselves and all others similarly situated,

     Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

     Defendant.

_____

## CLASS ACTION COMPLAINT WITH DEMAND FOR JURY TRIAL
_____

**Table of Contents**

INTRODUCTION ................................................................................................. 1

I.    NATURE OF THE ACTION ......................................................................... 5

II.   JURISDICTION AND VENUE ..................................................................... 6

III.  PARTIES .................................................................................................... 8

      A.   Plaintiffs ............................................................................................ 8

      B.   Defendant and Co-Conspirators ...................................................... 18

IV.   INTERSTATE TRADE AND COMMERCE ................................................ 21

V.    FACTUAL ALLEGATIONS ....................................................................... 21

      A.   The NCAA's Rules ........................................................................... 22

      B.   The NCAA's Arbitrary Implementation of the New Five-Year Eligibility Rule
      Harms Competition and Injures the Class .................................................. 24

VI.   CLASS ACTION ALLEGATIONS ............................................................. 26

VIOLATIONS ALLEGED ................................................................................... 30

PRAYER FOR RELIEF ..................................................................................... 34

DEMAND FOR JURY TRIAL ............................................................................ 35

i

Plaintiffs Brock Wisne, Aidan Shaw, Aislin Malcolm, Cade Tyson, Abigail Jefferies, Anthony Johnson, Louie Jordan, Jefferson De La Cruz Monegro, Isaiah Jones, Dimond Loosli, Brett Griffiths, and Jake Morell (hereinafter "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action complaint against Defendant the National Collegiate Athletic Association ("NCAA" or "Defendant") for violations of federal antitrust law. Based upon personal knowledge as to the facts pertaining to themselves, upon information and belief, and upon the investigation of counsel, Plaintiffs allege the following:

## INTRODUCTION

1.      Plaintiffs are a talented group of NCAA Division I collegiate athletes and students who come to this Court as a last resort and as a direct result of the NCAA's unlawful action in implementing a new eligibility rule on June 24, 2026 (hereinafter the "Five-Year Eligibility Rule") in a manner designed to prevent Plaintiffs from playing their sports at an NCAA member college or university for the 2026-2027 season.[1] Unless the Court grants Plaintiffs both immediate and lasting relief, Plaintiffs will incur significant irreparable harm and monetary damages. More specifically, Plaintiffs will forever lose the opportunity to complete the remainder of their collegiate careers alongside their teammates who will benefit from the rule change—as well as significant Name, Image, and Likeness ("NIL") compensation that is contingent on them playing this next season. And in some cases, despite the NCAA's stated concern for athletes' educational

---

[1] This rule is codified in section 12.6 of the Division I Manual and will be effective as of August 1, 2026.

1

opportunities, Plaintiffs will lose the scholarships and opportunities that they are counting on to finish their desired degrees.

2.      At its core, the Five-Year Eligibility Rule provides for athletes in Division I programs to compete for five seasons in the five years following the first day of enrollment in a collegiate institution or the first semester following their 19th birthday, subject to narrow predetermined exemptions.  The Plaintiffs have each completed just four years of collegiate sports. All are under 24 years of age.  By a proper reading of the NCAA's own rule, they should be entitled to a fifth season.  But the NCAA has decided that they are not.

3.      Through no fault of their own they have been arbitrarily singled out by the NCAA to be limited to four-seasons of eligibility, and deprived of the baseline fifth season of competition that the NCAA now deems to be the standard that it affords all other athletes. As a result of the NCAA's arbitrary decision, and absent intervention of this Court, Plaintiffs will be irreparably harmed by being deprived of the equal opportunity to participate in five seasons of athletic competition within the five-year window afforded to all other athletes and deprived of the tremendous educational benefits that come with such collegiate competition.

4.      The NCAA, for its part, will improperly foreclose Plaintiffs' access to the modern intercollegiate athletics market—and, for many, access to college itself—as a result of the NCAA's capricious decision not to apply the Five-Year Eligibility Rule to student-athletes who only competed four seasons thus far. These student-athletes, who have a year remaining in their five-year window, will be prevented from participating in

2

the five meaningful seasons of their sports that the NCAA has decided are now the proper baseline for collegiate athletes—a situation that is harmful in many circumstances, but that is especially harmful to athletes who, like Plaintiffs, are for whatever reason just hitting or regaining their academic and athletic stride later in their collegiate years.[2]

5.      Accordingly, Plaintiffs seek the protection of this Court to remedy the NCAA's violation of federal antitrust law through its monopsonistic behavior and arbitrary application of its eligibility rules to an athlete.

6.      The Plaintiffs here have each just completed four years of collegiate sports (in a variety of educational pathways). All are under 24 years of age. Through no fault of their own they have been arbitrarily declared ineligible -- deprived of the new baseline fifth season of play to which they would otherwise have been entitled under the new rule. Such action deprives some of the most experienced collegiate athletes of additional competitive opportunities—and in some cases opportunities to finish their degrees—and is plainly a restraint on trade.

7.      For years, courts have admonished the NCAA for violating the antitrust laws.  Rather than clean up their act and discontinue illegally and arbitrarily competition within the market for Division I college athletic labor, the NCAA has declared war.  NCAA President Charlie Baker has decreed that, instead of adopting rules and procedures

---

[2] The previous rules repealed by the Five-Year Eligibility Rule allowed for four seasons of competition in five years, with various waivers including medical hardship, extension-of-eligibility, season-of-competition, athletics activity, and delayed enrollment.

3

intended to abide by antitrust scrutiny, the NCAA is simply "going to fight them all."[3] Predictably, in a country governed by the Sherman Act, the Association's campaign is going poorly. A string of recent decisions finding antitrust violations have determined that the myriad eligibility rules and policies of the NCAA are subject to antitrust scrutiny and remedy. *See*, *e.g.*, *NCAA v. Alston*, 594 U.S. 69 (2021), *Ohio v. NCAA*, 706 F. Supp. 3d 583 (N.D.W. Va. 2023), *Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024); *Martinson v. NCAA*, 2025 WL 2678049 (D. Nev. Sep. 18, 2025).

8.    Nonetheless, the NCAA is determined to dictate just who can and cannot access the market for college athletic opportunities, and will utilize what is in essence a group boycott to do so. Here, the implementation of the Five-Year Eligibility Rule highlights how arbitrary the NCAA's regulations are. In the same breath as it allows for certain students to be subject to either the previous rules or the new rule, "whichever is most beneficial to the [college] athlete," it says that athletes who used "their final season of competition (under previous rules) during [the] 2025-2026" season get no additional eligibility.[4] In other words, through no fault of their own and solely because of the NCAA's arbitrary decision to delay the effective date of the Five-Year Eligibility Rule, Plaintiffs are barred from receiving a fifth year of eligibility even though their peers and classmates will receive that substantial educational and financial benefit.

---

[3] Bryan Fisher, *Charlie Baker Says NCAA Is 'Ready to Fight' As SCORE Act Stalls in Congress*, Sports Illustrated, https://www.si.com/college-football/charlie-baker-ncaa-ready-to-fight-score-act-stalls-congress, Dec. 9, 2025.

[4] https://www.ncaa.org/eligibility-center/division-i-age-based-eligibility-rules/

9.      As courts have determined time and again, the NCAA cannot arbitrarily and unreasonably restrict access to college and the opportunities of collegiate athletic competition—and collegiate athletes are entitled to the value of their services, irrespective of the rules and regulations that the NCAA is trying to enforce upon them.  The NCAA's decision to arbitrarily single-out Plaintiffs and those similarly situated, by limiting them, and only them, to four seasons of competition within a five-year window, is imposing ongoing, substantial harm on these student-athletes' educational and financial opportunities—harm that will, for many, dramatically negatively affect the trajectory of their lives.  This Court should prevent the NCAA from imposing arbitrary and unreasonable restrictions on this one group of student-athletes.

## I.      NATURE OF THE ACTION

10.      Plaintiffs seek damages and injunctive relief on behalf of themselves and all other similarly situated persons in the United States whose rights are implicated by the Five-Year Eligibility Rule.  They bring this action for injunctive relief and treble damages under Section 1 of the Sherman Act and demand a trial by jury.  To be clear, Plaintiffs do not challenge the rule as a whole in this action.  Rather, they challenge the application of the rule by the NCAA, which has in the past decade allowed athletes from the classes of 2017 through 2021, and 2023 onward to play five seasons, while singling out Plaintiffs and 2022 classmates who played four straight seasons from playing a fifth.

11.      Plaintiffs are talented athletes who are 2022 high school graduates who have played four years at NCAA schools but have not played five years.  They play a range of sports in the NCAA's Division I and all have athletic, academic and

5

developmental reasons to play another season.  The only barrier to them playing an additional season is the Five-Year Eligibility Rule.

12.     In *Alston* (594 U.S. 69), the U.S. Supreme Court unanimously held that the NCAA's limits on education-related benefits for college athletes violate federal antitrust laws and may be enjoined. Since *Alston*, scores of cases have been filed to challenge eligibility rules as illegal commercial gatekeeping restraints.

13.     Here, the NCAA's decision bars Plaintiffs from participating in the modern intercollegiate athletics market by denying them an additional year of access to scholarship-based participation, specialized academic programming, NIL compensation; national exposure, and professional development pathways.  As a result of the NCAA's actions, Plaintiffs and the class face immediate and irreparable harm, including but not limited to loss of athletic opportunity, educational harm, lost academic opportunities, and the benefits and support inherent to being on a collegiate team.  Money damages cannot fully compensate Plaintiffs or the class for these harms.

14.     Accordingly, Plaintiffs bring this action to challenge the Five-Year Eligibility Rule.

## II.     JURISDICTION AND VENUE

15.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) and seeks to recover damages and secure injunctive relief against Defendant for violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2). Plaintiff also seeks attorneys' fees, costs, and other expenses.

16.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

17.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the Class are citizens of a state different from Defendant.

18.     This Court has personal jurisdiction over Defendant because it transacts business in Colorado, participates in organizing intercollegiate athletic contests and licenses or sells merchandise in Colorado, has substantial contacts with Colorado, and is engaging in an illegal anticompetitive scheme that was directed at and has the intended effect of causing injury to persons residing in, located in, or doing business in Colorado.[5] NCAA colleges and universities are also found within this District, including Division I schools Colorado State University, the U.S. Air Force Academy, the University of Colorado at Boulder, the University of Denver, and the University of Northern Colorado.

19.     Venue is proper in this district pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. § 1391(b), (c) and (d) because a substantial portion of the affected interstate commerce discussed below has been carried out in this district, and because Defendant is licensed to and does business in this district and has transacted business in this district.

---

[5] Every facet of Defendant's actions laid out in this paragraph are carried out nationwide, as well.

### III.    PARTIES

### A.    Plaintiffs

20.    Plaintiff Brock Wisne is a 22-year-old men's basketball center who competed in the Big Sky Conference for the University of Northern Colorado.[6]  Brock is a Colorado native from Thornton, Colorado.   He received his degree in Business Administration, with a concentration in finance, from the University of Northern Colorado, where he was a four-year player on the Men's Basketball team. Brock worked his way into the starting rotation as a sophomore and developed over the last two seasons from a starter to an elite player. He is also an outstanding student having been selected to the 2025-26 Second Team All-Big Sky Conference and was selected to the 2026 College Sports Communicators (CSC) Academic All-District Team, an honor requiring a minimum 3.2 GPA, which he exceeded with a 3.65. This past season, Brock earned NIL compensation. With an additional year of eligibility, as a center who averaged 16.2 points per game, he would be certain to earn more NIL money. Brock epitomizes how an athlete can develop and improve over the course of his career, illustrating precisely why the NCAA's rules operate to fix prices by leaving behind the highest-value players, who are largely members of the class of 2022. A comparison of his freshman and senior seasons is telling: across the exact same number of games played (31), his scoring average rose from 5.2 to 16.2 points per game. As his ESPN profile reflects,[7] Brock developed in each

---

[6] Brock Wisne, Univ. of N. Colorado Athletics, https://uncbears.com/sports/mens-basketball/roster/brock-wisne/11953.
[7] Brock Wisne, ESPN, https://www.espn.com/mens-college-basketball/player/_/id/5107858/brock-wisne.

year of his career at Northern Colorado. If he were able to play another year in the NCAA, he would also be able to complete his MBA.

21.     Plaintiff Aidan Shaw is a 22-year-old men's basketball player who competed in the Atlantic Coast Conference for Boston College.[8] Aidan is an Overland Park, Kansas native who spent his first three seasons at the University of Missouri, playing in 92 games. Out of high school, he was a four-star recruit by ESPN, 247Sports, and Rivals, and was the third-rated player out of the state of Kansas. During his first two years at the University of Missouri, he was named to the 2022-23 SEC First-Year Academic Honor Roll and the 2023-24 SEC Academic Honor Roll. Aidan's athletic career was hampered due to injury, but he is fully capable of playing at his original level.  An additional year of eligibility would allow Aidan to (1) complete his undergraduate degree in Business Administration while competing in a full and complete basketball season to his maximum capability; (2) capitalize on potential NIL opportunities next season; and (3) further develop his playing skills and experience. This past season, Aidan earned significant NIL compensation. If he had another year of eligibility, he would be able to make substantially more.

22.     Plaintiff Aislin Malcolm is a 22-year-old women's basketball guard who competed in the Horizon League for Robert Morris University.[9] A Pittsburgh native, Aislin began her career at the University of Pittsburgh, where she arrived as a top-100 recruit with multiple Division I offers. After leaving Pitt due to coaching issues, Aislin spent her

---

[8] Aidan Shaw, Boston College Athletics, https://bceagles.com/sports/mens-basketball/roster/aidan-shaw/25724.

[9] Aislin Malcolm, Robert Morris University Athletics, https://rmucolonials.com/sports/womens-basketball/roster/aislin-malcolm/10153.

last season at Robert Morris, where she returned to peak form, served as team captain, started all 30 games, and earned Horizon League All-Conference Third Team honors while leading the conference in free-throw percentage at 84.4%.[10]   Aislin earned significant NIL compensation this past year and could again earn a significant amount with another year of eligibility. An additional year of eligibility would also allow Aislin to complete her college career and obtain her MBA.

23.    Plaintiff Cade Tyson is a 22-year-old men's basketball guard who competed in the Big Ten Conference for the University of Minnesota.[11] A North Carolina native from Monroe, North Carolina, Cade received his degree in Sports Management from the University of Minnesota, where he was a star player on the Men's Basketball team. Cade began his college career at Belmont University in Nashville, Tennessee, where he was a reliable starter, starting 59 of 61 games while averaging 13.2 and 16.2 points per season and earning Second Team All-MVC honors as a sophomore. Cade's last year at Minnesota saw his emergence as an elite player and the Gophers' go-to scorer.[12]   He averaged 19.6 points per game, including a 20-point performance against the University of Michigan, the 2026 NCAA Basketball National Champions.[13]   He received a 2025-26

---

[10] Robert Morris' Aislin Malcolm Wins Horizon League Player of Week, Robert Morris Sports Now, https://robertmorrissportsnow.com/robert-morris-aislin-malcolm-wins-horizon-league-player-of-week/.

[11] Cade Tyson, University of Minnesota Athletics, https://gophersports.com/sports/mens-basketball/roster/cade-tyson/23333.

[12] Cade Tyson Has Become Minnesota's Go-To Scorer and the Gophers Are Riding the Wave, Busting Brackets, https://bustingbrackets.com/cade-tyson-has-become-minnesota-s-go-to-scorer-and-the-gophers-are-riding-the-wave-basketball.

[13] Cade Tyson, ESPN, https://www.espn.com/mens-college-basketball/player/_/id/5107970/cade-tyson.

All-Big Ten Honorable Mention (Second Team), and his 628 points in the 2025-26 season ranked third among the highest single-season point totals in University of Minnesota history, while his 175 free throws also placed him third all-time in school history for a single season. Cade earned substantial NIL compensation this past season. If he had another year of eligibility, he could earn substantial NIL compensation again and earn a graduate degree that will provide him with a life-long benefit.

24.    Plaintiff Abigail Jefferies is a 21-year-old track-and-field athlete who competes in the Northeast Conference ("NEC") at Long Island University.[14] A native of St. Albans, New York, Abigail has competed in track and field since she was six years old, and through years of dedication and hard work she earned a college athletic scholarship that allowed her to pursue two lifelong goals: competing at the collegiate level and working toward her dream of becoming a pediatric physician. Throughout her collegiate career, she has been an indoor and outdoor conference point-scorer and a conference medalist, consistently contributing to her team's success. Abigail began her college career at Delaware State University, specializing in the hurdles and shot put, before transferring to Alabama A&M University, where she competed as a pentathlete and multi-event athlete across the hurdles, shot put, high jump, long jump, sprints, javelin, and 800-meter run. At her coaches' encouragement, she used preseason meets as an opportunity to develop her high jump, and in December 2024, during her junior season, she sustained a season-ending left Achilles injury. The injury prevented her from

---

[14] Abigail Jefferies, Long Island University Athletics,
https://www.liuathletics.com/sports/womens-track-and-field/roster/abigail-jefferies/7156.

11

competing for the remainder of the season and cost her a full year of athletic participation through circumstances beyond her control. She had a successful last season at LIU but had been unable to obtain a redshirt for her final year of eligibility. After she transferred, an evaluation of her academic credits required her to make up a significant number of credits that were lost in the transfer to LIU, and she is now entering her senior year, preparing to take the MCAT this September and planning to attend medical school after earning her bachelor's degree. An additional year of eligibility is important to Abigail academically, financially, and athletically, as it would provide the opportunity to regain athletic scholarship support as she completes her undergraduate education and prepares for medical school.

25.    Plaintiff Anthony "Pig" Johnson is a 22-year-old men's basketball guard who competed in the Big 12 Conference for Arizona State University.[15] Pig is an Alabama native from Midfield, Alabama. He received his degree in Business Administration from Arizona State University, where he was a standout player on the Men's Basketball team. He has been called "Pig" since childhood, a nickname his mother gave him after he would return home dirty from playing football in his regular clothes as a boy.  Johnson spent three years of his college journey first at a junior college and then at a NAIA school, where he earned accolades as a two-time Mid-South First Team All-Conference selection and the Mid-South Conference Player of the Year.  He was a first-team NAIA All-American, averaging 23.6 points per game in 2024-25 to lead all of the NAIA in scoring. This allowed

---

[15] Anthony "Pig" Johnson, Arizona State Sun Devil Athletics, https://thesundevils.com/sports/mens-basketball/roster/player/anthony-pig-johnson.

him to transfer to Division I Arizona State, where he became the team's go-to "Sixth Man," averaging 13.2 points per game.[16] He earned significant NIL compensation this past season, and if he had another year of eligibility, he could make substantially more.

26.     Plaintiff Louie Jordan, a 23-year-old men's basketball forward, competed in the Big South Conference for Radford University.[17] Louis is from Leicester, England, but traveled to the United States for college.  He spent two seasons at Weber State, where he earned Big Sky all-academic honors in 2022-23, before transferring to the University of Maryland, Baltimore County (UMBC). In a breakout 2024-25 season at UMBC, Louie started all but one of his 31 games and emerged as one of the best three-point shooters in the country, connecting on 48.8% of his three-point attempts on more than 120 attempts while averaging 7.5 points and 3.9 rebounds per game—a mark that ranked among the top returning three-point shooters in the NCAA.[18] He transferred to Radford for the 2025-26 season. This past season, Louie earned significant NIL compensation. If he had another year of eligibility, he would be able to make substantially more.  Additionally, Louie received his bachelor's degree in interdisciplinary studies from Radford, and would be interested in pursuing a Masters degree.

---

[16] Sun Devils' Sixth Man Continues to Keep Team Afloat, Sports Illustrated, https://www.si.com/college/arizonastate/; Anthony "Pig" Johnson Leads Arizona State Past Baylor in Big 12 First Round, Field Level Media, https://fieldlevelmedia.com/ncaab/anthony-pig-johnson-leads-arizona-state-past-baylor-in-big-12-first-round/.

[17] Louie Jordan, Radford University Athletics, https://radfordathletics.com/sports/mens-basketball/roster/louie-jordan/9307.

[18] Men's Basketball Announces Roster for Upcoming 2025-26 Season, Radford University Athletics, https://radfordathletics.com/news/2025/6/19/mens-basketball-mens-basketball-announces-exciting-roster-for-upcoming-2025-26-season.aspx.

27.    Plaintiff Jefferson De La Cruz Monegro, a 23-year-old men's basketball guard, competed in the Big West Conference for California State University, Fullerton.[19] A 6-foot-3 guard from LaSalle, Ontario, Canada, Jefferson played his high school basketball at Orangeville Prep before beginning his collegiate career at Western Michigan University, where he spent two seasons and, in 2023-24, started 30 of 32 games while leading the Broncos with 98 assists and averaging 8.8 points per game. He transferred to Valparaiso University for his junior season, averaging approximately 10 points per game and helping lead the team to a Missouri Valley Conference Tournament semifinal appearance.[20] Jefferson then transferred to Cal State Fullerton for his senior season, where he emerged as a key contributor, including a career-high 26-point performance against UC Santa Barbara in January 2026. This past season, Jefferson earned significant NIL compensation. If he had another year of eligibility, he would be able to make substantially more. Furthermore, Jefferson received his bachelor's degree in American studies and if he had another year of eligibility, he would pursue a Masters in Sports Management.

28.    Plaintiff Isaiah Jones, a 23-year-old men's basketball forward, competed in the American Athletic Conference for the University of South Florida.[21] A 6-foot-7 forward

---

[19] Jefferson De La Cruz Monegro, Cal State Fullerton Athletics, https://fullertontitans.com/sports/mens-basketball/roster/jefferson-de-la-cruz-monegro/5667.

[20] The Titans Sign 6'3 Guard Jefferson De La Cruz Monegro, Cal State Fullerton Athletics, https://fullertontitans.com/news/2025/5/15/mens-basketball-the-titans-sign-6-3-guard-jefferson-de-la-cuz-monegro.aspx.

[21] Isaiah Jones, University of South Florida Athletics, https://gousfbulls.com/sports/mens-basketball/roster/isaiah-jones/15691.

14

from Nashville, Tennessee, Isaiah is pursuing a degree in Communications. He began his collegiate career at the University of Detroit Mercy, where he was named Horizon League Freshman of the Week during the 2022-23 season, before transferring to Oakland University, where he played two seasons and, as a junior in 2024-25, averaged 6.8 points and 4.5 rebounds per game and started in the Golden Grizzlies' NCAA Tournament game against third-seeded Kentucky. He transferred to South Florida for the 2025-26 season, where he contributed to a Bulls team that won the American Athletic Conference regular-season title and earned the No. 1 seed in the conference tournament.[22] This past season, Isaiah earned significant NIL compensation. If he had another year of eligibility, he would be able to make substantially more.  Isaiah received his bachelor's degree in Communications and if he had another year of eligibility, he would pursue a Masters in Business with a marketing concentration.

29.    Plaintiff Dimond Loosli is a 23-year-old right-handed pitcher who competed in the Big Ten Conference for Penn State University.[23] Dimond is from Pleasant Hill, California, and began his college career playing baseball at the University of Hawaii, where he was offered a redshirt after the fall season. He transferred to Orange Coast College over winter break, where he played for two years and, as a starter, led the team to back-to-back California junior college playoff runs. After his sophomore year at Orange Coast, Dimond was offered a scholarship and NIL compensation to attend and play

---

[22] USF Men's Basketball Claims the 1 Seed in the American Conference Tournament, 247Sports, https://247sports.com/college/south-florida/article/usf-mens-basketball-wins-american-conference-277079272/.
[23] Dimond Loosli, Penn State Athletics, https://gopsusports.com/sports/baseball/roster/player/dimond-loosli.

15

baseball at Penn State University. In his junior year at Penn State, he appeared in 22 games, led the Nittany Lions in winning percentage, and served as the team's high-leverage pitcher. He appeared in all three Big Ten Championship games and was the winning pitcher against USC in the semifinal. Dimond graduated in May 2026 with a bachelor's degree in communications. This past season, Dimond earned significant NIL compensation. If he had another year of eligibility, he would be able to make substantially more, and he would be able to pursue a master's degree.

30.     Plaintiff Brett Griffiths is a 21-year-old baseball player from Sacramento, California. Brett began his collegiate baseball career at Folsom Lake College. He later transferred to American River College. During his time there, he was named First Team All-Conference after ranking second in the Big 8 Conference with 43 conference hits and a .422 conference batting average. He finished the season with a .371 overall batting average and 62 hits. Brett then transferred to Ball State University. During the 2026 season, he was the team's starting shortstop and started all 55 games. He batted .307 with 65 hits, 43 runs scored, 45 RBIs, 15 doubles, 6 home runs, and finished tied for fourth in NCAA Division I baseball in triples. For his performance, he was named Second Team All-MAC and earned Academic All-MAC honors. He completed his bachelor's degree while maintaining a 3.788 GPA. During the 2025-2026 academic year, Brett earned significant NIL compensation. If he had another year of eligibility, he would be able to make substantially more.

31.     Plaintiff Jake Morell is a 22-year-old left-handed pitcher and an economics student at Seattle University. A native of Roseville, California, Jake has built his collegiate

16

career through perseverance, academic achievement, and a commitment to continuous development both on and off the baseball field. Jake began his collegiate baseball career at American River College in Sacramento, where he competed for two seasons, from the fall of 2022 through the spring of 2024, while earning an Associate of Science degree in Business. During his sophomore season, he demonstrated his versatility by contributing as both a pitcher and a first baseman, batting .250 while also making 14 pitching appearances. Following American River College, Jake transferred to Jessup University, where he continued his academic and athletic development. During the 2024-2025 season, he made 15 appearances on the mound, posting a 1-1 record with a 2.25 ERA over 20 innings while recording 28 strikeouts and limiting opposing hitters to a .208 batting average, and he earned PacWest All-Academic recognition. Jake transferred to Seattle University for the 2025-2026 academic year, where he competes as a left-handed pitcher for the Redhawks. Standing six feet four inches and weighing 222 pounds, he appeared in 21 games as a relief pitcher, pitching 30.2 innings with 44 strikeouts, while pursuing a Bachelor of Science in Economics with an anticipated graduation date of December 2026. Jake earned significant NIL compensation this past season. If he had another year of eligibility, he could earn more NIL compensation while completing his Bachelor of Science in Economics and further developing as a left-handed pitcher to improve his prospects of signing a professional baseball contract.

**B.      Defendant and Co-Conspirators**

32.      Defendant National Collegiate Athletic Association holds itself out as an unincorporated non-profit education organization.  Its principal place of business is in Indianapolis, IN.

33.      The NCAA is the governing body of college sports with approximately 1,100 member colleges and universities throughout the United States, including institutions in the District of Colorado. It is a member-controlled organization that claims it exists to regulate college sports and protect college athletes. The NCAA's Mission and Priorities state that the organization is "guided by its commitment to college athlete well-being, fair and inclusive competition, and opportunities for academic and athletics success across all divisions."[24] The NCAA's Constitution Principles further articulate a purported dedication to "The Primacy of Academic Experience," "The Collegiate Student-Athlete Model," and "Student-Athlete Wellbeing."[25] But despite that stated mission, the NCAA oversees a massive commercial enterprise that generates billions of dollars from the labor and performance of college athletes.

34.      There are 1,086 active NCAA member schools, and these schools are organized into three Divisions. Division I includes 366 schools, including 265 with major football programs. These are the best-known schools in the country. Divisions II and III

---

[24] NCAA Mission and Priorities, NCAA, https://www.ncaa.org/about-us/mission-and-priorities/.

[25] NCAA Constitution Principles, NCAA, https://www.ncaa.org/about-us/mission-and-priorities/constitution-principles/. Note that the term "student-athlete" is a construct used by the NCAA as a means to obfuscate the labor of college athletes and is disfavored by those who actually play.

18

include schools with less extensive athletic programs, more limited or localized competition, lower or no athletic scholarship offerings, and reduced athletic budgets. As a practical matter, any academic institution that wishes to participate in any meaningful way in the highest and most popular levels of college sports must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members.

35.    As the NCAA acknowledged in *Alston*, 594 U.S. at 90, its member schools collectively enjoy a monopoly in the market for college athlete services, such that its restraints can and do harm competition. With such power, the NCAA has grown into what one court has described as a "financial behemoth," with "revenues often exceeding $1 billion annually." *Johnson v. NCAA*, 108 F.4th 163, 170 (3d Cir. 2024).

36.    Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports. The Constitution and Bylaws were adopted by votes of the member institutions (though often only select subsets of such institutions) and may be amended by votes of the member institutions (or select subsets thereof). The NCAA is responsible for the passing, implementation, and enforcement of the Five-Year Eligibility Rule. Beyond including college athlete members chosen not by their college-athlete peers, but by the NCAA and/or member institutions and affiliates on certain NCAA committees, there is no involvement of, or formal NCAA process for soliciting input from, or considering the input of, athletes in formulating rules such as the Five-Year Eligibility Rule.

19

37.     The NCAA generates billions of dollars largely because of the massive commercial success of Division I men's and women's basketball, FCS (lower Division I) football, and other NCAA championship sports. Together, Division I college sports rank among the most profitable entertainment products in the country- outstripping sports as venerable and as much a part of the national firmament as Major League Baseball. Only, the NFL surpasses the collegiate sports enterprise in annual revenue. In the 2024–2025 season alone, the NCAA, itself, reported approximately $1.56 billion in revenue, driven overwhelmingly by the talent, labor, and marketability of college athletes. Yet despite creating that value, athletes have long been restricted by NCAA rules from sharing fairly in the economic success they help produce.

38.     In its Consolidated Financial Statements for the fiscal year ending August 31, 2025, the NCAA reported total revenues of $1,566,533,639.[26]  The vast majority of that money came from Television and Marketing Rights Fees for the March Madness men's basketball tournament, which brought in revenues of $1,121,881,244 – over one billion dollars to broadcast and market these collegiate competitors. [27]

39.     Co-conspirators, while not named as defendants, facilitate the NCAA's illegal conduct in promulgating and enforcing the Five-Year Eligibility Rule.  They include Division I conferences and member institutions, and representatives of member

---

[26] NCAA Consolidated Financial Statements August 31, 2025.
https://ncaaorg.s3.amazonaws.com/ncaa/finance/2024-25NCAAFIN_FinancialStatement.pdf
[27] *Id.*

institutions and conferences that serve on NCAA Division I committees responsible for promulgating the rule change.

## IV.    INTERSTATE TRADE AND COMMERCE

40.    Before and after the promulgation of the Five-Year Eligibility Rule, the NCAA has substantially affected interstate commerce.    Defendant's wrongdoing described herein substantially affects interstate trade and commerce in the United States and harms athletes who would otherwise compete for member institutions.

## V.    FACTUAL ALLEGATIONS

41.    It is a well-trod path discussing the NCAA's anticompetitive effects.    The antitrust violations alleged in this Complaint occur in Division I athletics, which covers more than 360 NCAA member institutions, 6,000 teams, and 190,000 NCAA athletes. Division I generates more than a billion dollars in revenue every year, including nearly $1.5 billion in revenue in the 2022-23 school year.    While it is hard to quantify exactly how much money is being paid for NIL, the NCAA recently agreed to pay $2.8 billion in "back pay" damages to Division I athletes who participated in college athletics between 2016 and 2024.

42.    The NCAA regulates the market for college athletic labor by promulgating rules to which all of its member institutions are expected to adhere.    These rules, as laid out in the NCAA Constitution, Bylaws, and Division I Manual, specify to a high degree whether and how student athletes are allowed to participate in Division I.    And, as Justice Brett Kavanaugh noted in his concurrence in *Alston*, "the NCAA's remaining compensation rules also raise serious questions under the antitrust laws."    594 U.S. at

21

108.  Every rule put forth by the NCAA indicates an agreement among the NCAA and its member institution to restrict the market for Division I athletic labor, having direct implications for the ability of hundreds of thousands of athletes to receive compensation for the skill and effort they put in which generates billions of dollars in revenue.

43.     The relevant geographic market is as broad as the United States. NCAA member institutions exist in all 50 states and multiple territories, and the plaintiffs may accept opportunities in each of the 50 states, when recruited.

### A. The NCAA's Rules

44.     NCAA Bylaw 12.6 lays out the Five-Year Eligibility Rule.  It states:

12.6 Five-Year Period of Eligibility. An individual's period of eligibility for practice and competition shall be limited to Five-Years. An individual's five-year period of eligibility begins with the earlier of the following: (Revised: 7/31/14, 6/6/25 effective 7/1/25, 6/24/26 effective 8/1/26)
> (a) The regular academic term (semester or quarter) of an academic year in which the individual enrolls in a collegiate institution (domestic or foreign; see Bylaw 14.02.4) in a minimum full-time program of studies and attends a class in that term while enrolled full time; or
> (b) The beginning of the regular academic year immediately after the individual's 19th birthday.

…

12.6.6 Service Exceptions to the Five-Year Period of Eligibility. Time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government is excepted from the application of the five-year period of eligibility. Among such services that qualify for an exception are: (Revised: 4/2/10, 7/31/14, 6/6/25 effective 7/1/25, 6/24/26 effective 8/1/26)
> (a) Military Sea Transport Service;
> (b) Peace Corps; or
> (c) Service as a conscientious objector ordered by the Selective Service Commission (or the equivalent authority in a foreign nation) in lieu of active military duty.

12.6.6.1 Elapsed Time/Service to Enrollment. If a [college] athlete enrolls in a regular term of a collegiate institution at the first opportunity following completion of one of the service exceptions, the elapsed time (the exact number of calendar days) between completion of the service and the first

22

opportunity for enrollment may be added to the exact number of days served on active duty in the armed services, with foreign aid services or on official religious missions and will not count toward the [college] athlete's Five-Years of eligibility. It is not permissible to extend the five-year period by any additional time beyond the first opportunity to enroll (the opening day of classes of the first regular term at the institution in which the [college] athlete enrolls as a regular student immediately following the termination of the active-duty commitment). (Revised: 4/2/10, 7/31/14, 6/6/25 effective 7/1/25, 6/24/26 effective 8/1/26)

…

12.6.8 Waivers. There shall be no waivers of the application of the five-year period of eligibility legislation.

(Adopted: 6/24/26 effective 8/1/26)

45.    The NCAA does not explain why it has decided to allow certain exceptions to the Five-Year Period of Eligibility but not others— it had previously allowed many different types.   The NCAA retains all decision-making authority as to whether an exception shall apply to an athlete.

46.    The NCAA utilizes nasty weapons to ensure athletes and colleges are afraid to challenge their regulations in court.

47.    The first, known as the "Rule of Restitution," NCAA Bylaw 12.9.4.2 is a regulation stating that "if a [college] athlete who is ineligible under the terms of the bylaws or other [NCAA] legislation is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative … and said injunction is voluntary vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified," the NCAA may take actions that punish the institution.  In other words, the Rule of Restitution allows the NCAA to retroactively punish an athlete, their coaches,

23

teammates and opponents, and their institution if a court-ordered injunction is later overturned on appeal. That punishment can be severe.

48. The second is a newly adopted anticompetitive ban on what the NCAA calls "Ghost Transfers," codified in Division I Manual Rule 13.1.1.4.9, where the NCAA will both suspend a team's head coach for half a season *and* fine the college's budget for the sport 20% if they deem that a player "transferred" to the team outside of the player transfer portal. While it is a clear restraint on the market for student athlete services, the severe penalties in place ensure that players are unable to have colleges compete for their services outside of the express structures controlled by the NCAA.

## B. The NCAA's Arbitrary Implementation of the New Five-Year Eligibility Rule Harms Competition and Injures the Class

49. The NCAA's conduct has harmed the class by creating a poorly designed hard and fast rule with only arbitrary exceptions, a rule designed with seemingly little consideration of issues that have regularly occurred in the past and that can be easily foreseen as likely to recur in the future. Most importantly, the rule extends a valuable benefit to one group of athletes—those who, through waiver or fortunate timing will receive the benefit of playing for five total years—while foreclosing that benefit to the class members, who through no fault of their own were deemed eligible for four seasons but cannot play a fifth, even if they would like to remain in school.

50. There are many athletes in this cohort, including the named Plaintiffs. Most obviously, many athletes are excluded from the benefit of the new rule simply because they came to college at the wrong time. Athletes who came to college in 2022, as part of the four-year class that would graduate in 2026, are the only ones of their cohort who are

24

limited by the NCAA to four years of competition.  Athletes who came to college in 2021 and graduated in 2025 received an extra "Covid" season, and those who came to college in 2023 and will graduate in 2027 receive the benefits of the new five-year rule.

51.    There are also athletes who will foreseeably be prevented from the benefit of a fifth year of competition because of circumstances outside of their control.  These include athletes whose five-year eligibility is interrupted for sports-related reasons (like those who need to take time off from college to train or participate in Olympic and international competition); those who lose a season to injury; those who are mistreated or abused by coaches to the point that they cannot play or must transfer; those who are victimized by roster manipulation or losing playtime to force a transfer; or those who lose eligibility due to administrative factors beyond their control such as compliance errors, bad institutional advice, or other school or coach misconduct.  All will lose seasons of competition and athletic performance alongside academic opportunity, as a result of the new Five-Year Eligibility Rule.

52.    The new rule's arbitrary and discriminatory implementation will also harm athletes who need to transfer but cannot timely and freely access the transfer portal (for example, athletes at service academies who decide to resign and pursue their degrees at civilian institutions).  Their eligibility clock will keep running, but due to the interplay between the new NCAA rule imposing draconian budgetary and coach discipline penalties for accepting Ghost Transfers and the Five-Year Eligibility Rule, such athletes will be forced to sit out a season of competition (and will likely suffer loss of conditioning

25

and personal development at the same time) and only be able to compete for four seasons rather than their peers' five seasons.

53.    Finally, athletes who lose a season because of events completely outside their control, such as a school closure, post-portal program shutdown or mid-season program cancellation, university bankruptcy, natural disaster confined to a single region, or conference disruption will also be harmed by the inflexibility of the Five-Year Eligibility Rule.    Under the current rules, waivers to help athletes achieve their athletic and academic objectives could at least be sought – but here the arbitrary new rules will make relief unattainable.

54.    To the extent relevant to the antitrust claims asserted herein, the NCAA's practices are not reasonably necessary to achieve any cognizable procompetitive or legitimate business justification.    There is no inherent difference between Plaintiffs and class members and their colleagues who receive the largesse of five years under the rule, other than they completed four years of eligibility straight in a row.    Their talent, age, size, experience, susceptibility to cause or suffer injury, or any other metric is indistinguishable from their peers who received the extra year.    When examined in the broader context, where the NCAA is fine with its athletes going forward receiving five years of eligibility, but not those who fall into the class, there is no justification to deny class members the opportunity to compete for one additional year.

## VI.    CLASS ACTION ALLEGATIONS

55.    Plaintiffs Brock Wisne, Aidan Shaw, Aislin Malcolm, Cade Tyson, Abigail Jefferies, Anthony Johnson, Louie Jordan, Jefferson De La Cruz Monegro, Isaiah Jones,

26

Dimond Loosli, Brett Griffiths, and Jake Morell bring this action on behalf of themselves and as representatives of a class under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), seeking damages and equitable and injunctive relief on behalf of the following class:

> All persons in the United States who began to play in NCAA Division I sports in the 2022-2023 season and completed four years of eligibility as defined by the NCAA's prior rules by the conclusion of the 2025-2026 season, and are therefore barred from playing a fifth season due to the NCAA's adoption and immediate implementation of the Five-Year Eligibility Rule.

56.     Excluded from the Class are: (1) the Defendant's officers, directors, and employees; (2) any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action; and (3) any student athlete who has filed an individual or group claim regarding the Five-Year Eligibility Rule at the time of a motion for class certification in this action.

57.     **Numerosity**. The Class is so numerous that joinder would be impracticable. Upon information and belief, there are likely thousands of athletes who may be affected by the Five-Year Eligibility Rule.  While the true number can only be determined through discovery, Plaintiffs are informed and believe that Class members identities may be ascertained through records maintained by the NCAA.

58.     **Commonality.** There are questions of law and fact common to the Class, including but not limited to:

a.     Whether Defendant violated the antitrust laws;

b.     Whether Defendant engaged in anticompetitive conduct;

27

c.      Whether Plaintiffs and members of the Class were harmed by Defendant's conduct;

d.      Whether Plaintiffs and members of the Class are entitled to injunctive and declaratory relief to end Defendant's conduct;

e.      Whether Plaintiffs and members of the Class are entitled to damages, and if so, what the appropriate measure of class-wide damages is.

59.     **Typicality.** Plaintiffs' claims are typical of those of other members of the Class because Plaintiffs and Class members are all subject to the Five-Year Eligibility Rule. Plaintiff's claims and those of other members of the Class arise from the same operative facts related to the rule and are based on the same legal theories. Plaintiffs are advancing the same claims and legal theories on behalf of themselves as other members of the Class, and thus Plaintiffs' interests are typical of, and not antagonistic to, those of other members of the Class.

60.     **Adequacy of representation.** Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no disqualifying conflicts of interest that would make them antagonistic to other members of the Class. Plaintiffs have retained counsel experienced in antitrust class action litigation and intend to vigorously prosecute this action.

61.     **Predominance.** The common questions of law and fact identified above predominate over any questions affecting only individual Class members.  These include:

28

a. Whether the NCAA entered into an unlawful contract, combination, or conspiracy by agreeing to artificially fix, depress, maintain, and/or stabilize Division I athlete opportunities for NIL;

b. Whether the NCAA unreasonably established and/or maintained monopoly levels of market power by limiting and continuing to limit the field of athletes eligible for scholarships, competitive opportunities, NIL payments, and other renumeration and rewards related to performance and participation in NCAA athletics;

c. Whether the conduct of the NCAA and any co-conspirator caused members of the Class to receive fewer opportunities to pursue higher education while participating in collegiate sports than members of the Class would have received in the absence of the Defendant's unjustified and anticompetitive restrictions; and

d. Whether the conduct of the NCAA and any co-conspirator caused members of the Class to receive less NIL and other compensation than members of the Class would have received in the absence of the Defendant's unjustified and anticompetitive restrictions; and

e. Whether the Class is entitled to, among other things, declaratory and injunctive relief and, if so, the nature and extent of such relief.

62.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Pursuing numerous individual lawsuits would not be economically feasible for individual members of the Class, given the relatively small damages suffered by class members compared with the expense and

29

burden of prosecuting a complex antitrust lawsuit. Given the likely large number of class members, joinder would be impracticable. A class action will preserve judicial resources by allowing the common issues of the Class to be adjudicated in a single forum, avoiding the need for duplicative discovery and hearings in individual actions based on the same facts. In addition, the benefits of proceeding through the class mechanism substantially outweigh any difficulties that may arise in management of this class action. Moreover, prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

## VIOLATIONS ALLEGED

### FIRST CAUSE OF ACTION
**Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
(Per Se or Rule of Reason)**

63.    Plaintiffs restate and incorporate all allegations contained in the above paragraphs as if fully rewritten herein.

64.    Section One of the Sherman Act prohibits contracts, combinations, and conspiracies that unreasonably restrain trade or commerce within interstate commerce. This Court is invested with jurisdiction to restrain and enjoin violators of the Sherman Act.

65.     Here, the anticompetitive effects of the NCAA's decision to foreclose certain student athletes from the modern intercollegiate athletics market far outweigh any procompetitive benefits. Eligibility is a prerequisite for athletes both receiving athletic scholarships and earning NIL and other compensation. Therefore, rules that restrict who can play are inextricably tied to an athlete's academic and economic opportunities—both

30

those attained merely by competing in college, such as NIL compensation, and those that accrue over a lifetime from earning advanced degrees during a fifth year of competition. An athlete who is declared ineligible by the NCAA is categorically excluded from the modern intercollegiate athletic market and unable to receive those economic opportunities.

66.    The NCAA's Five-Year Eligibility Rule is categorically an arbitrary, capricious, unreasonable restraint on trade under the Sherman Act. There is no meaningful difference between Plaintiffs and class members and those afforded five years of eligibility by the implementation of the Five-Year Eligibility Rule.  The NCAA indicates as much by allowing athletes to claim the eligibility afforded to them under the most favorable interpretation of either the old rules or the new rule—except for the members of the class.

67.    As a result, the NCAA's Five-Year Eligibility Rule in the nationwide market for athletes in Division I sports constitutes an unreasonable restraint on trade. Specifically, the rule produces anticompetitive effects, including but not limited to reduced labor supply, diminished quality of competition, exclusion of athletes due to numerous circumstances beyond their control, and foreclosure of a college athlete's academic, scholarship, revenue sharing, and NIL opportunities tied to eligibility.

68.    Courts have consistently found that the NCAA's procompetitive justifications for its eligibility rules are applied inconsistently and undermine any argument that they exceed the devastating anticompetitive effects to college athletes, universities, and consumers. The arbitrary design of the new Five-Year Eligibility Rule, its inflexibility,

and the capricious choices made by the NCAA both in limiting exemptions and in categorically depriving virtually all Class of 2022 high school graduates, but no other class of graduates, of a fifth year of competition undermine the NCAA's procompetitive justifications even more. As a result, the NCAA can no longer plausibly invoke these supposed justifications to enforce the Five-Year Eligibility Rule.

69.    Finally, less restrictive alternatives exist within the NCAA's own bylaws. As noted before, the NCAA is already giving athletes who may have different eligibility formulations under the old and new rules the option to apply the rule that is most favorable to the athlete. The NCAA can do so here by granting the same fifth year of competition to class members who elect to return to campus.

70.    Plaintiff and members of the Class have been injured by the NCAA's anticompetitive conduct, including but not limited to by being foreclosed from the opportunity to play a fifth season and from the scholarship and/or NIL money that such a season could bring.

### SECOND CAUSE OF ACTION
**Breach of Contract; Third-Party Beneficiary**
**(Obligation to provide equal opportunity to compete to all athletes)**

71.    Plaintiffs incorporate by reference all allegations contained in the paragraphs above as if fully restated herein.

72.    The NCAA Constitution and Bylaws constitute a binding contract between the NCAA and its member institutions across the United States.

73.    The NCAA determines the eligibility of any college athlete to compete in NCAA Division I sports.

32

74.    Under any interpretation of applicable state law, Plaintiffs are intended third-party beneficiaries of the contractual relationship between the NCAA and their respective member institutions, and not merely incidental beneficiaries of that relationship.  As intended third-party beneficiaries, the Plaintiffs are entitled to enforce the NCAA's obligations under the NCAA Constitution and Bylaws.

75.    The NCAA breached its obligations to Plaintiffs by adopting the Five-Year Eligibility Rule, thus excluding Plaintiffs and class members from the opportunity for an additional season which other athletes are receiving.  This exclusion is inconsistent with the reasonable expectations by the Plaintiffs and class members of fairness and equity of opportunity between athletes who are third party beneficiaries of (and subject to the enforcement of) the NCAA Constitution and Bylaws.

76.    Plaintiff and members of the Class have been injured by the NCAA's breach of contract, including by including but not limited to by being foreclosed from the opportunity to play a fifth season and from the scholarship and/or NIL money that such a season could bring.

## <u>THIRD CAUSE OF ACTION</u>
### Declaratory Judgment

77.    Plaintiffs incorporate by reference all allegations contained in the paragraphs above as if fully restated herein.

78.    Plaintiffs seek a declaration that the NCAA's enforcement of the Five-Year Eligibility Rule is unlawful and unenforceable under the Sherman Act and violates their rights.

79.    A real controversy exists because the resolution of this dispute will potentially confer rights upon Plaintiffs.

80.    The dispute is justiciable because Plaintiffs are suffering harm based on the NCAA's enforcement of the Five-Year Eligibility Rule against them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully asks that this Court:

- Certifies a Class pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), directs that notice of this action be given to the Class, and appoints Plaintiffs as representatives of the Class and appoints their counsel of record as co-lead Class counsel;

- Enters judgment against Defendant and in favor of Plaintiffs and the Class, holding Defendant liable for the antitrust violations alleged herein;

- Declare the NCAA's enforcement of its Five-Year Eligibility Rule violates the laws governing breach of contract as applicable to third party beneficiaries;

- Enjoin Defendant from enforcing its Five-Year Eligibility Rule and Rule of Restitution against Plaintiffs, Class Members, and the teams, or by enforcing roster limits or other rules that would prevent Plaintiffs and Class Members from playing in the 2026-2027 season, or enforcing against Plaintiffs and Class Members a cap on compensation limits otherwise laid out in the settlement stemming from the *House v. NCAA* and similar litigation;

34

- Award Plaintiffs and Class Members compensatory damages, exemplary damages, treble damages, and/or punitive damages, as permitted by each statute and/or common law claim;

- Award Plaintiffs and Class Members their costs and reasonable attorneys' fees where permitted by law;

- Grant such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and members of the Class demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

Dated: July 8, 2026

Respectfully submitted,

*/s/ Alex Wilschke*
Bruce L. Braley
Alex R. Wilschke
Brian N. Aleinikoff
Adrian G. Johnson
**LEVENTHAL PUGA BRALEY P.C.**
950 S. Cherry St., Suite 600
Denver, CO 80246
Telephone: 303-759-9945
Facsimile: 303-759-9692
bbraley@leventhal-law.com
awilschke@leventhal-law.com
brian@leventhal-law.com
ajohnson@leventhal-law.com

Robert K. Shelquist*
**CUNEO GILBERT FLANNERY & LaDUCA, LLP**
5775 Wayzata Blvd., Suite 620

St. Louis Park, MN 55416
Telephone: (202) 789-3960
rshelquist@cuneolaw.com
zfreed@cuneolaw.com

Christian Hudson*
Alexandra Klein*
**CUNEO GILBERT FLANNERY
& LaDUCA, LLP**
222 Livingston Street, Unit 2
Brooklyn, NY 11201
Telephone: (202) 789-3960
christian@cuneolaw.com
aklein@cuneolaw.com

Daniel Cohen*
Zachary Freed*
**CUNEO GILBERT FLANNERY
& LaDUCA, LLP**
2445 M Street NW, Ste. 740
Washington, D.C. 20037
Telephone: (202) 789-3960
christian@cuneolaw.com
aklein@cuneolaw.com

Elliot S. Abrams*
**CHESHIRE PARKER SCHNEIDER &
ABRAMS, PLLC**
133 Fayetteville Street, 4th Floor
P.O. Box 1029
Raleigh, NC 27602
(919) 833-3114 (TEL)
(919) 832-0739 (FAX)
elliot.abrams@cheshirepark.com

J. Barton Goplerud*
**SHINDLER, ANDERSON,
GOPLERUD & WEESE, P.C.**
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265-5749
Telephone:      (515) 223-4567
Facsimile:      (515) 223-8887
Email:          goplerud@sagwlaw.co

36

C. Peter Goplerud III*
**NATIONAL LITIGATION LAW GROUP**
401 W. Broadway Ave.
Enid, OK 73701
pgoplerud@nationlit.com
904-502-9515


*to be admitted.*