IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:26-cv-03063-CNS-KAS

BROCK WISNE,
AIDAN SHAW,
AISLIN MALCOLM,
CADE TYSON,
ABIGAIL JEFFERIES,
ANTHONY JOHNSON,
LOUIE JORDAN,
JEFFERSON DE LA CRUZ MONEGRO,
ISAIAH JONES,
DIMOND LOOSLI,
BRETT GRIFFITHS, and
JAKE MORELL on behalf of themselves and all others similarly situated,

     Plaintiffs,

v.

 NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

     Defendant.

---

**ORDER**

---

Plaintiffs are athletes who have competed in four seasons of collegiate sports. They seek to compete in a fifth season while enrolled as full-time students during their fifth year of college. In June 2026, the National Collegiate Athletic Association (NCAA) adopted a new rule that would allow some athletes to do just this—play five seasons within a student-athlete's five-year period of full-time enrollment. But Plaintiffs, due to the timing of their high school graduation and number of seasons in which they have already

1

competed, are not allowed to do so under this rule. Instead, they are limited to four years of play during five years of study. Plaintiffs seek injunctive relief because implementation of this rule denies them the opportunity to compete in a fifth season of their collegiate careers, and because this rule and the NCAA's conduct amounts to a violation of federal antitrust law.

Before the Court is Plaintiffs' Motion for Temporary Restraining Order, ECF No. 19. The motion is fully briefed. For the reasons set forth below, the Court GRANTS Plaintiffs' motion.[1]

## I.      BACKGROUND[2]

Plaintiffs are NCAA Division I collegiate athletes. *See, e.g.,* ECF No. 1 at ¶ 1; ECF No. 19-6 at ¶ 2; ECF No. 19-4 at ¶ 2. As illustrations, Plaintiff Abigail Jeffries is an undergraduate student at Long Island University and track and field athlete, "specializing in hurdles and shot put." *Id.* Plaintiff Brock Wisne is an undergraduate student at the University of Northern Colorado, where he competes on the school's basketball team.

---

[1] Although Plaintiffs style their motion as one seeking a temporary restraining order, they alternatively seek a preliminary injunction. *See* ECF No. 19-1 at 25. Given this, and after ordering responsive briefing from the NCAA and permitting Plaintiffs to file a reply, the Court construes Plaintiffs' motion as a preliminary injunction motion, referring to it as such throughout this order. And because the Court construes Plaintiffs' motion as one seeking preliminary injunctive relief, the Court ultimately issues a preliminary injunction rather than a temporary restraining order. *See id.*

[2] The background facts are taken predominantly from Plaintiffs' Class Action Complaint, ECF No. 1, and the parties' briefs and attendant evidentiary submissions, *see, e.g.,* ECF Nos. 32–22, 35–36. *See also Denver Homeless Out Loud v. Denver, Colorado,* 514 F. Supp. 3d 1278, 1285 (D. Colo. 2021), *vacated and remanded on other grounds*, 32 F.4th 1259 (10th Cir. 2022). The Court is not required to hold a hearing before ruling on Plaintiffs' motions. *See, e.g., Northglenn Gunther Toody's, LLC v. HQ8-10410-10450 Melody Lane LLC,* 702 F. App'x 702, 705 (10th Cir. 2017) ("[N]either Fed. R. Civ. P. 65(a) nor this circuit's precedent require the district court to hold an evidentiary hearing or oral argument before deciding a motion for a preliminary injunction"). Especially where, as here, the Court permitted the NCAA "ample opportunity" to present its own responsive arguments to Plaintiffs' motion and file supporting evidentiary submissions. *Id.*

*See* ECF No. 19-7 at ¶ 1. Plaintiffs enrolled at NCAA member schools in 2022 following their high school graduation. *See id.* at ¶ 3; ECF No. 19-5 at ¶ 7; ECF No. 19-4 at ¶ 4; ECF No. 19-6 at ¶ 4.

The NCAA is the governing body for college sports in the United States. *See, e.g.,* ECF No. 1 at ¶ 33; ECF No. 32-at 1 ¶ 4 ("The NCAA is a voluntary, self-governing association composed of member colleges, universities, and athletic conferences across the country that come together to administer college athletics."). There are over 1,000 active NCAA member colleges and universities (schools, for short) spread across three Divisions: Division I, Division II, and Division III. *See id.* at ¶¶ 5, 11; ECF No. 1 at ¶ 34. Division I includes over 350 schools, which are the "best known" NCAA schools in the United States. *See id. See also* ECF No. 32-1 at ¶¶ 5, 8. Division I member schools are divided into conferences, *see id.* at ¶ 8, such as the Southeastern Conference, ECF No. 19-3 at ¶ 23.

The NCAA has a Constitution and Bylaws, adopted by its member schools, which govern collegiate athletics. *See, e.g.,* ECF No. 1 at ¶ 36. Prior to June 2026, under NCAA Bylaw 12.6, student-athletes, including Division I athletes, were only permitted to compete in four seasons of competition within five years of full-time enrollment at an NCAA member school. *See, e.g.,* ECF No. 32-1 at ¶ 14; ECF No. 19-1 at 10. But in June 2026, the NCAA changed course. *See, e.g.,* ECF No. 19-3 at ¶ 10.[3] Under the "new age-based eligibility model," ECF No. 32-1 at ¶ 16, which Plaintiffs call the "Five Year Eligibility Rule,"

---

[3] Some evidence in the record indicates that the NCAA made this change on June 22, 2026, whereas some evidence indicates this change was made on June 23. *Compare* ECF No. 32-1 at ¶ 16, *with* ECF No. 19-3 at ¶ 10. To avoid confusion, the Court refers to this change as occurring in June 2026. Regardless, whether the NCAA made this change on June 22 or June 23 is immaterial.

ECF No. 19-3 at ¶ 10, Division I athletes will be given up to five years of eligibility if they enroll in college no later than the academic year after their nineteenth birthday, *see id. See also* ECF No. 32-1 at ¶ 17; ECF No. 1 at ¶¶ 2 ("[T]he Five-Year Eligibility Rule provides for athletes in Division I programs to compete for five seasons in the five years following the first day of enrollment in a collegiate institution or the first semester following their 19th birthday, subject to narrow predetermined exemptions.").

The Five-Year Eligibility Rule (or Rule, for short) poses a problem for Plaintiffs. It does not apply to athletes who began playing in 2022 and were deemed by the NCAA to have completed four years of competition. *See, e.g.,* ECF No. 19-3 at ¶ 10; ECF No. 1 at ¶¶ 2, 50; ECF No. 32-1 at ¶ 26; ECF No. 19-1 at 11. So Plaintiffs are ineligible to play a fifth season of college sports—despite wanting to do so—due to the NCAA's eligibility determination. *See, e.g.,* ECF No. 1 at ¶ 3; ECF No. 19-6 at ¶ 9; ECF No. 19-4 at ¶ 10; ECF No. 19-5 at ¶ 7. This not only prohibits Plaintiffs from competing in a fifth season, but also denies them specialized academic programming, compensation from name, image, and likeness (NIL) agreements, "national exposure, and professional development pathways." ECF No. 1 at ¶ 13. In the words of Plaintiff Dimond Loosli, "I will lose the opportunity to further develop my skills and showcase them at one [of] the top baseball programs in the country . . . . Not only could I earn substantially greater NIL compensation, but the increased exposure would also bring me closer to fulfilling my dream of playing [professional baseball]. ECF No. ECF No. 19-5 at ¶ 8. Plaintiff Jeffries makes a similar point: "Without athletic eligibility, I will lose my athletic scholarship. ECF No. 19-4 at ¶ 9

4

The NCAA reasoned that applying the Rule "retroactively" would "destabilize college sports," ECF No. 32-1 at ¶ 21, resulting in a circumstance where Plaintiffs, based on their enrollment year and years of competitive play, are precluded from competing in a fifth season. The NCAA declined to apply the Rule retroactively because it believed doing so would create "roster chaos," *id.*, for member schools.

In Plaintiffs' eyes, proper—not arbitrary—implementation of the Rule should allow them to compete for a fifth season. *See, e.g.,* ECF No. 19-1 at 14; ECF No. 19-3 at ¶ 11. The Rule is set to go into effect August 1, 2026, meaning that Plaintiffs face ineligibility to play a fifth season and attendant harms on that date. *See, e.g.,* ECF No. ECF No. 1 at 4 n.1; ECF No. 32-3 at 4 n.3.

Plaintiffs seek relief in the form of a preliminary injunction "enjoining the NCAA from implementing" the Rule "as it is currently promulgated." ECF No. 19-1 at 7. Specifically, Plaintiffs seek equitable relief, on behalf of themselves and the class of Division I athletes they seek to represent, "prevent[ing] the NCAA from illegally barring the Class Members from play." *Id.* (citation modified). In seeking this relief, Plaintiffs contend they are likely to succeed on the merits of their antitrust claim brought under Section 1 of the Sherman Act. *See id.* at 15.[4] Plaintiffs' antitrust theory is based on allegations that the NCAA is an illegal monopsony whose Rule is an unreasonable restraint on trade. *See, e.g.,* ECF No. 1 at ¶ 66.

---

[4] Plaintiffs also assert breach of contract and declaratory judgment claims against the NCAA. *See* ECF No. 1 at 35–36. Those claims are not at issue in Plaintiffs' preliminary injunction motion.

Plaintiffs filed their Class Action Complaint on July 8, 2026. ECF No. 1. They filed the instant motion, and their class certification motion, on July 15, 2026. ECF Nos. 19–20. The Court ordered expedited briefing on both motions. ECF No. 26. In compliance with that order, the NCAA filed its responses to Plaintiffs' motions on July 23, 2026, and Plaintiffs filed their replies on July 27, 2026. ECF Nos. 32–33, 35–36.

## II.    LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019) (citation modified). To prevail on a preliminary injunction motion, movants must show: "(1) they are 'likely to succeed on the merits,' (2) they are 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [their] favor,' and (4) 'an injunction is in the public interest.' " *M.G. through Garcia v. Armijo*, 117 F.4th 1230, 1238 (10th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). "An injunction can issue only if each factor is established." *Denver Homeless Out Loud v. Denver, Colorado*, 32 F.4th 1259, 1278 (10th Cir. 2022) (citation modified). Where a requested injunction would "change the status quo" or "mandate action," the preliminary injunction motion is considered "disfavored," and a movant bears a "heavier burden" on the *likelihood of success on the merits* and *balance of harm* factors. *Free the Nipple-Fort Collins*, 916 F.3d at 797 (citation modified).[5]

---

[5] The NCAA argues that Plaintiffs seek one such disfavored injunction because they "seek relief that changes the status quo," namely relief that makes them eligible to participate in the upcoming season whereas they currently cannot. ECF No. 32 at 9. Plaintiffs contest this characterization of their challenge, arguing that they simply seek to preserve the prior "waiver" status quo, under which they would could have

Before proceeding in its discussion of the parties' merits arguments, the Court addresses the parties' articulations of this legal standard. Plaintiffs understand they bear the burden of showing a *likelihood of success* on the merits, *see* ECF No. 19-1 at 14, whereas the NCAA contends they bear the burden of showing a *substantial likelihood of success on the merits*, *see* ECF No. 32 at 8 (citing *Winter*, 555 U.S. at 24). Plaintiffs correctly articulate what this legal standard demands. *Winter* itself is plainspoken: "[T]he plaintiff must show a likelihood of success on the merits . . . ." 555 U.S. at 32 (citation modified). But the Court understands why the NCAA would urge application of a *substantial likelihood* standard, given the Tenth Circuit has used this exact language itself from time to time. *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024) ("A plaintiff seeking [a preliminary] injunction must establish ... a substantial likelihood that they will ultimately succeed on the merits of their suit.") (citation modified)). *But see M.G.*, 117 F.4th at 1238; *Sanchez v. Bondi*, No. 1:25–cv–02287–CNS, 2025 WL 2550646, at *1 (D. Colo. Aug. 20, 2025) (observing that "the Tenth Circuit has articulated competing standards for the first factor movants must satisfy"). Regardless, the Court takes the Supreme Court's recent guidance as clarification and confirmation that Plaintiff's take is the correct one: They must only show a *likelihood of success* on the merits of their claims. *See Mahmoud v. Taylor*, 606 U.S. 522, 546 (2025) ("To obtain that form of

---

received eligibility waivers, such that they do not seek a "disfavored" injunction. *See* ECF No. 35 at 7. The Court need not resolve this issue because under either burden—typical or "heavier," *Free the Nipple-Fort Collins*, 916 F.3d at 797—Plaintiffs have met their *preliminary injunction* burdens. Fundamentally, the Court has "closely scrutinized" Plaintiffs' arguments and the evidentiary record to ensure that granting their request for injunctive relief is proper. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005). The Court, for simplicity's sake, refers to Plaintiffs' burden as a *likelihood of success on the merits* burden throughout this order, but reiterates that Plaintiffs have met their burden under the "heavier" standard as well.

preliminary relief, the [movants] must show that they are likely to succeed on the merits . . . ." (citing *Winter*, 555 U.S. at 20)); *Wallace v. Jaffree*, 472 U.S. 38, 47 n.26 ("Federal district courts and circuit courts are bound to adhere to the controlling decisions of the Supreme Court." (citation modified)).[6]

### III.     DISCUSSION

The Court first addresses two threshold issues raised by the NCAA in its response brief: Whether the Court has personal jurisdiction over it, and whether a settlement agreement in a separate federal action bars Plaintiffs' claims in this case. It addresses these separately and in turn below. After doing so, the Court turns to the merits of Plaintiffs' preliminary injunction motion.

### A. Personal Jurisdiction

The NCAA argues that the Court lacks personal jurisdiction over it "because the Plaintiffs do not allege any forum-related conduct from which this suit arises and the allegations of general affiliations with Colorado have been rejected." ECF No. 32 at 9 n.3. Plaintiffs disagree, arguing that the NCAA has essentially conceded that Plaintiff Wisne "shows a sufficient likelihood of success on establishing personal jurisdiction," ECF No. 35 at 6 (citation modified), and that this is sufficient for the Court to exercise personal jurisdiction over the NCAA, since all of Plaintiffs' claims are "identical" to his, *id.* Plaintiffs elaborate that the Court has specific personal jurisdiction over the NCAA because the

---

[6] Given that application of the *substantial likelihood* standard imposes a heavier burden on any plaintiff—"substantial"—relative to the *likelihood of success* standard, application of a *substantial likelihood* standard could inadvertently hold a plaintiff seeking a non-disfavored injunction to the same, "heavier" standard that applies to plaintiffs seeking "disfavored" injunctions. *See Schrier*, 427 F.3d at 1259. Recall, however, that Plaintiffs have shown entitlement to relief under either the typical, or heavier *disfavored* burden for preliminary injunctions.

NCAA has "purposefully directed its activities at residents of the state and Plaintiffs' injuries arise out of [the NCAA's] forum-related activities." *Id.* at 6 n.3. The Court agrees with Plaintiffs that they have met their *personal jurisdiction* burden.

The parties agree on core jurisdictional principles: Personal jurisdiction is essential for the Court's own exercise of jurisdiction over Plaintiffs' claims, and Plaintiffs bear the burden of establishing it. *See, e.g., Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999); *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065 (10th Cir. 2007). The NCAA's jurisdictional challenge attends *specific personal jurisdiction*, *see* ECF No. 32 at 9 n.3, which demands that Plaintiffs show their lawsuit arises out of or relates to the NCAA's contacts with this forum—i.e., Colorado. *See, e.g., Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017); *Hood v. Am. Auto Care*, LLC, 21 F.4th 1216, 1221 (10th Cir. 2021) (explaining that specific jurisdiction is proper where "there is an affiliation between the forum and the underlying controversy" (citation modified)). In this antitrust action, Plaintiffs can meet their jurisdictional burden by showing that the NCAA "purposefully directed" its activities at Colorado by "committing an intentional act" or acts that were "expressly aimed at the forum state" and "caus[ed] harm the [NCAA] kn[ew] [was] likely to be suffered in the forum state." *Shields v. Fed'n Internationale de Natation*, 419 F. Supp. 3d 1188, 1203 (N.D. Cal. 2019) (citation modified). *See also id*. (explaining that "purposeful direction" test for *personal jurisdiction* applies in "antitrust actions," such as those alleging violations of Sections 1 and 2 of the Sherman Act).

9

Explained below, Plaintiffs have met their burden. In explaining why, the Court focuses first on the allegations and arguments that attend Plaintiff Wisne, and then turns to the parties' *personal jurisdiction* arguments regarding the remaining Plaintiffs and their claims.

*First*, as to Plaintiff Wisne, the NCAA acknowledges that he resides in Colorado. *See* ECF No. 32 at 9 n.3 (citing ECF No. 1 at ¶ 20); ECF No. 19-7 at ¶ 1 ("I was born and raised in Thornton, Colorado, where I am also domiciled."). Yet the NCAA contends Plaintiffs cannot show it purposely directed its activities toward Colorado where the Rule was promulgated through a deliberative process "facilitated from the NCAA's headquarters in Indianapolis, Indiana." ECF No. 32 at 9 n.3. Notably, the NCAA offers no evidentiary citation in support of this proposition.[7] In any event, Plaintiff Wisne has adequately shown at this stage, where Plaintiffs' preliminary injunction burden is "light," *Intercon, Inc. v. Bell Atl. Internet Sols., Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000), that the NCAA purposefully directed its activities towards Colorado in a manner that injured him and gave rise to this lawsuit. *See also Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011) (characterizing "burden of establishing personal jurisdiction" as "prima facie showing" when the issue is raised "early on in litigation" (citation modified)). As Dr. David Berri states in his declaration—and the NCAA cannot seriously dispute—the Rule that Plaintiffs challenge has, and will, reach colleges and universities nationwide, including colleges and universities in Colorado. *See* ECF No. 19-3 at ¶ 10; ECF No. 1 at

---

[7] Independent review of the parties' evidentiary submissions reveals that Geoff Silver, the NCAA's Vice President of Division I Governance and Member Services, stated in his declaration that the NCAA's headquarters is in Indianapolis. *See* ECF No. 32-at ¶ 9. Mr. Silver does not opine as to whether the Rule was promulgated there. Regardless, as explained below, Plaintiffs have met their jurisdictional burdens.

¶ 18 (alleging that NCAA college and universities are "found within" Colorado, including Division I schools such as Colorado State University and the University of Colorado at Boulder).[8] Plaintiff Wisne has, and will, certainly feel its effects in Colorado. *See* ECF No. 19-7 at ¶¶ 5–7. This evidence supports Plaintiffs' allegation that the NCAA both "transacts business" and has "substantial contacts" with Colorado, but also that its allegedly "anticompetitive scheme was directed at and has the intended effect of causing injury" to individuals domiciled here. ECF No. 1 at ¶ 18.

Accordingly, the preliminary injunction record provides sufficient evidence from which the Court may conclude that Plaintiffs have met their burden of making a prima facie showing the Court has specific personal jurisdiction over the NCAA regarding Plaintiff Wisne's claims. *See, e.g., In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 744 (9th Cir. 2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) (observing in antitrust context that by "alleging acts 'intended to have' an effect in Wisconsin, the Plaintiffs went beyond alleging acts with a 'mere foreseeable effect' in the forum" and thus met their jurisdictional burden); *Shields*, 419 F. Supp. 3d at 1209–13 (concluding plaintiffs in an antitrust case satisfied all *specific personal jurisdiction* burdens where the defendant's "purposeful direction of its anticompetitive conduct at the United

---

[8] The NCAA challenges Dr. Berri's declaration as "incompetent evidence" because it does not explicitly reference 28 U.S.C. § 1746(2). ECF No. 32 at 13. Dr. Berri declares in his supplementary declaration, submitted in connection with Plaintiffs' reply brief, that in stating his initial declaration was submitted "under penalty of perjury' that this statement was intended to "confirm that [his] statements [were] true and correct under" § 1746. ECF No. 35-1 at ¶ 2. The Court is assured that Dr. Berri's original declaration is competent evidence that the Court may consider, and rejects the NCAA's contrary argument. *See, e.g., Cross v. Equityexperts.org, LLC*, No. 1:17–CV–03804–AT–JCF, 2019 WL 2494599, at *8 (N.D. Ga. Apr. 17, 2019), *report and recommendation adopted sub nom. Cross v. Equity Experts.Org, LLC*, No. 1:17–CV–3804–AT, 2019 WL 13059913 (N.D. Ga. Aug. 16, 2019).

States [was] directly related to" the plaintiffs' claims). The NCAA's citation to *Keanaaina v. Nat'l Collegiate Athletic Ass'n*, No. 26–cv–01283–NYW–KAS, 2026 WL 1213385, at *5 (D. Colo. May 4, 2026), fails to persuade, given *Keanaaina*'s plaintiff failed to allege any facts "detailing any case-specific contacts that [the NCAA] had with Colorado itself," *id.* (citation modified). Plaintiffs' allegations and evidence do not suffer this pleading deficiency, given that Plaintiffs allege not only that Plaintiff Wisne is personally affected by the NCAA's Rule, but also that the NCAA transacts business in the state, organizes events here, that its allegedly anticompetitive scheme was directed at Colorado, which is home to several NCAA and Division I schools, and that the NCAA knew its anticompetitive scheme would affect colleges and collegiate athletes in Colorado. *See* ECF No. 1 at ¶ 18; *In re Western States*, 715 F.3d at 743; *Walden v. Fiore*, 571 U.S. 277, 288 n.7 (2014); *Dudnikov v. Chalk & Vermilion Fine Arts, Inc*., 514 F.3d 1063, 1076 (10th Cir. 2008) ("[D]efendants . . . are alleged to have intended their extra-forum conduct to reach and affect plaintiffs' business operations in Colorado." (citation modified)). And the NCAA has presented no meaningful argument as to why it would be unreasonable for the Court to exercise personal jurisdiction over it regarding Plaintiff Wisne's claims, yet in any event the Court concludes that such exercise is entirely reasonable given that Plaintiffs have made this prima facie showing. *Cf. Shields*, 419 F. Supp. 3d at 1213 (denying a motion to dismiss for lack of personal jurisdiction where defendant "fail[ed] to present a 'compelling case' that the exercise of personal jurisdiction . . . would be unreasonable" (citation modified)).

12

*Second*, the NCAA argues that, even if the Court has jurisdiction over it with respect to Plaintiff Wisne's claims, that the remaining Plaintiffs cannot "bootstrap their claims to [his] for purposes of personal jurisdiction." ECF No. 32 at 9 n.3. This is the better supported of the NCAA's jurisdictional arguments. *See id.* (collecting cases). But even the cases that the NCAA marshals undermine its own argument. For instance, in *Lee v. Branch Banking & Tr. Co.*, No. 18–21876–Civ, 2018 WL 5633995, at *4 (S.D. Fla. Oct. 31, 2018), the district court dismissed claims against defendant where certain plaintiffs "did not dispute" their complaint "contain[ed] no allegations connecting [their] claims" to the forum state, and that "[n]one of those [p]laintiffs were Florida citizens." Yet defendant *was* subject to specific personal jurisdiction in Florida for one plaintiff's claim, who was alleged to be a "citizen of Florida" and the injury that this plaintiff suffered was alleged to have occurred in Florida. *Id.* at *5. This case tracks *Lee*, insofar as discussed above the NCAA *is* subject to personal jurisdiction for Plaintiff Wisne's claims. And because the Court, as discussed in its class certification order, certifies Plaintiffs' class, this is sufficient to confer personal jurisdiction for the remaining Plaintiffs. *See, e.g., Mussat v. IQVIA, Inc.*, 953 F.3d 441, 448 (7th Cir. 2020) ("The rules for class certification support a focus on the named representative for purposes of personal jurisdiction."); *id.* ("[A] class action may extend beyond the boundaries of the state where the lead plaintiff brings the case. And nothing in the Rules frowns on nationwide class actions." (citation modified)); *Murphy v. Aaron's, Inc.*, No. 19–cv–00601–CMA–KLM, 2020 WL 2079188, at *8 (D. Colo. Apr. 30, 2020) ("[F]ederal courts in the Tenth Circuit and across the country have entertained nationwide class actions arising under federal law without questioning personal

jurisdiction over a nonresident defendant as to nonresident class members' claim." (citation modified)).

Accordingly, the Court agrees with Plaintiffs that the Court may exercise personal jurisdiction over the NCAA. *See* ECF No. 35 at 6.

## B. Release & The *House* Settlement

The NCAA argues that Plaintiffs are members of the settlement class in *In re College Athlete NIL Litigation*, Case No. 4:20–cv–03919–CW (N.D. Cal. July 26, 2024) (*House*). ECF No. 32 at 19.[9] Therefore, the NCAA's argument goes, because the approved *House* settlement class released certain claims, this settlement "forecloses Plaintiffs' injunctive relief claims." *Id.* at 20. *See also House*, Case No. 4:20–cv–03919–CW, ECF No. 980 (entering final judgment "in accordance with the terms of the [*House*] Settlement Agreement" and approving the same). Plaintiffs read *House*'s settlement agreement differently, arguing that—after giving effect to its plain terms—the agreement does not bar their claims in this case. *See* ECF No. 35 at 7. The Court agrees with Plaintiffs.

Of course, release is an affirmative defense to any claim. *See* Fed. R. Civ. P. 8(c)(1); *Denver Homeless*, 32 F.4th at 1281 n.2 (Rossman, J., dissenting). In determining whether any settlement agreement contains such a release, courts turn first to the settlement agreement itself, using ordinary principles of contract interpretation to

---

[9] As explained by the Fourth Circuit, "[j]ust this past year, the NCAA reversed decades of anti-compensation rules by agreeing through a settlement to allow member schools to pay players directly up to twenty-two percent of the revenue from media rights, ticket sales, and sponsorships with student athletes. This is commonly referred to as the House settlement." (citation modified)). *Robinson v. Nat'l Collegiate Athletic Ass'n*, 172 F.4th 271, 280 n.1 (4th Cir. 2026).

determine their scope and meaning. *See, e.g., Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008) ("Under Colorado law, contracts should be interpreted consistently with the well-established principles of contractual interpretation." (citation modified)).[10]

The plain and ordinary terms of the *House* settlement agreement do not constitute a release of Plaintiffs' claims. In reaching this conclusion, the Court does agree with the NCAA, *see* ECF No. 32 at 19, that Plaintiffs fall under the *House* settlement agreement's defined "Injunctive Relief Class," defined as: "All student-athletes who compete on, competed on, or will compete on a Division I athletic team at any time between June 15, 2020 through the end of the Injunctive Relief Settlement Term." *House*, Case No. 4:20–cv–03919–CW, ECF No. 958-1 at 9. But this alone does not mean Plaintiffs are "bound" by the settlement agreement. ECF No. 32 at 20. The "Released Injunctive Class Claims" only reach claims that concern "NCAA and conference rules . . . regarding (1) monies and benefits that may be provided to student-athletes by the NCAA, Division I conferences, and/or Division I Member Institutions under NCAA or conference rules; (2) NCAA roster and scholarship limits as agreed to in the Injunctive Relief Settlement; or (3) the subjects addressed by the Related Injunctive Relief NCAA & Conference Rules." *House*, Case No. 4:20–cv–03919–CW, ECF No. 958-1 at 12–13. And "Related Injunctive Relief NCAA

---

[10] Plaintiffs urge application of Colorado interpretive principles. *See* ECF No. 35 at 7. The NCAA offers its own interpretation of the *House* settlement agreement's terms without citation to any guiding interpretive authority. And the settlement agreement itself instructs that its provisions "shall be construed and enforced in accordance with, and governed by, federal common law." *House*, Case No. 4:20–cv–03919–CW, ECF No. 958-1 at ¶ 54. The Court need not resolve which interpretive framework applies because, under Colorado and federal common law principles, the Court's analysis is the same: It looks to the plain and ordinary meaning of the agreement's terms. *See Level 3*, 535 F.3d at 1154; *Republic Res. Corp. v. ISI Petroleum W. Caddo Drilling Program 1981*, 836 F.2d 462, 465 (10th Cir. 1987).

& Conference Rules" are defined elsewhere as "NCAA and conference rules prohibiting NIL payments by Associated Entities or Individuals (individually or collectively) to current or prospective student-athletes"; "NCAA and conference rules governing the number of seasons/length of time student-athletes are eligible to receive benefits, including scholarships and payments pursuant to the Injunctive Relief Settlement, including without limitation any rule capping the number of years a student-athlete may receive payments at four years"; NCAA and conference rules "NCAA and conference rules requiring that student-athletes continue to make progress toward a degree while enrolled in any Member Institution"; "All existing (at the time of filing for preliminary approval of the Injunctive Relief Settlement) NCAA rules regarding the compensation and benefits that may or may not be provided by Division I conferences or Member Institutions to student-athletes"; "NCAA and conference rules . . . permitting student-athletes the ability to seek guidance . . . prior to entering into a proposed NIL contract or agreement"; rules "permitting a student-athlete to retain or regain eligibility" by rescinding or modifying agreements pursuant to the Injunctive Relief Settlement and "returning, as necessary, and compensation or consideration received pursuant to a non-compliant agreement"; and rules "addressing circumvention" subject to certain settlement terms. *Id.* at 13–15.[11]

These released claims, on their face, concern NIL agreements, negotiation, and compensation. They do not concern the Rule and its eligibility changes that Plaintiffs challenge here. And while the *House* settlement provision that the NCAA cites in urging

---

[11] Recall "NIL" stands for *name, image, and likeness. See, e.g., Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 759 (E.D. Tenn. 2024).

release does concern NCAA and conference rules "governing the number of seasons/length of time student-athletes are eligible to receive benefits," it is clear that the "benefits" this provision contemplates attend *monetary* benefits regarding student-athletes' NIL. *See id.* at 14 (discussing "any rule capping the number of years a student-athlete may *receive payments at four years*" (emphasis added)). This language is not so broad as to reach—and therefore release—Plaintiffs' challenge to the *eligibility* strictures of the Rule. Which, notably, was adopted after the *House* settlement agreement was approved and finalized. *Compare House*, Case No. 4:20–cv–03919–CW, ECF No. 980, *with House*, Case No. 4:20–cv–03919–CW, ECF No. 958-1 at 12 (describing "Released Injunctive Class Claims" as those that "were raised or could have been raised in the Action prior to Final Approval or during the Injunctive Relief Settlement Term on account of, arising out of, or resulting from the continuation of existing (*at the time of filing for preliminary approval of the Injunctive Relief Settlement*) NCAA and conference rules" (emphasis added)).

Accordingly, the plain language of the *House* settlement agreement does not operate as a release of Plaintiffs' claims that challenge the Rule's adoption and implementation.[12]

---

[12] Plaintiffs cite a case that ultimately concerned the preclusive effect of a prior settlement agreement. *See Denver Homeless*, 32 F.4th at 1271. For the sake of completeness, analyzing the NCAA's argument under *preclusion* principles—as well as analyzing this argument as a matter of *release*—the *House* settlement agreement has no preclusive effect on this case. The *House* settlement agreement *excluded* from its release any claims based on rules that had not yet "existed" at the time of filing for preliminary approval, *id.* at 12, which ultimately—and unambiguously—concerned NIL contracts and negotiations. Thus, while settlement agreements *may* have preclusive effect, this is true only "if it is *clear* that the parties intended preclusion as part of their agreement." *Denver Homeless*, 32 F.4th at 1271 (citation modified). There is no such clarity here. *Cf id.* ("The plain text of the [at-issue] settlement agreement makes *clear* the parties intended it to have preclusive effect." (citation modified)); *id.* at 1275 (observing that settlement had

17

### C. Request for Injunctive Relief

Having dispensed with the NCAA's threshold arguments, the Court now considers whether Plaintiffs have met their preliminary injunction burden. *See M.G.*, 117 F.4th at 1238.

### 1. Likelihood of Success on the Merits

Plaintiffs' motion focuses on their Sherman Act claim. *See, e.g.,* ECF No. 19-1 at 15 ("Plaintiffs are likely to prevail on their claim that the NCAA's implementation of its Five-Year Rule violates Section 1 of the Sherman Act."). As the parties acknowledge, the Court's *likelihood of success on the merits* analysis proceeds in several steps. *Compare id.* at 16–17, *with* ECF No. 32 at 11. It takes those steps in order, first considering whether the Rule is a *commercial* restraint under the Sherman Act. Because it is, the Court then analyzes whether it is an unreasonable restraint.

### a. Commercial Restraint

Section 1 of the Sherman Act outlaws contracts "in restraint of trade or commerce." 15 U.S.C. § 1. "Restraint" means an "unreasonable," *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997), or "undue," *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 81 (2021), restraint. *See also Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (explaining "unreasonable" and "undue" are synonymous in Section 1 context). But fundamentally, Section 1 of the Sherman Act outlaws commercial restraints. *See, e.g., Robinson*, 172 F.4th at 287. Thus, to meet their *likelihood of success on the merits* burden, plaintiffs

---

preclusive effect where defendants "continued to enforce *the same custom*" at issue in prior action (citation modified)).

advancing Section 1 claims must show that the challenged conduct is commercial in nature. *See, e.g., id.*

The NCAA argues that "[t]ime-based eligibility rules are not commercial restraints within the purview of the Sherman Act." ECF No. 32 at 11 n.4. Plaintiffs challenge this assertion, citing contrary "precedent on this specific issue," ECF No. 35 at 8 n.6. The Court agrees with Plaintiffs that, under the Sherman Act, the Rule is commercial in nature.

As Plaintiffs observe, at least three federal appellate courts have queried this specific issue—whether NCAA eligibility rules are commercial under Section 1 of the Sherman Act—and answered *yes*, that such rules *are* commercial. Their reasoning is persuasive. Eligibility rules, such as the Rule here, restrain the labor of college athletes, including Plaintiffs. This Rule and the manner of its implementation prohibit Plaintiffs from playing a fifth season of college sports. *See, e.g.,* ECF No. 1 at ¶ 3; ECF No. 19-6 at ¶ 9; ECF No. 19-4 at ¶ 10; ECF No. 19-5 at ¶ 7.

In the words of the Fourth Circuit, "[t]his restraint on labor through association rulemaking interferes with student athletes' free exercise of their rights to engage in commerce (i.e., participate in Division I football)." *Robinson*, 172 F.4th at 289. The Third and Seventh Circuits are in accord. *See Elad v. Nat'l Collegiate Athletic Ass'n*, 160 F.4th 407, 415 (3d Cir. 2025) (concluding eligibility rule was commercial "because it interfer[ed] with [plaintiff's] desire to compete in NCAA Division I athletics and profit from that participation . . . . [s]tated differently, [plaintiff] alleges that the [rule] limits his participation in a labor market"); *Fourqurean v. Nat'l Collegiate Athletic Ass'n*, 143 F.4th 859, 863 (7th Cir. 2025). And *Elad* observed its conclusion was consistent with the Supreme Court's

19

recognition that "restraints on labor through association rulemaking that 'unduly interfere with the free exercise of the[ ] rights by those engaged, or who wish to engage, in trade and commerce' are subject to the Sherman Act." 160 F.4th at 415 (quoting *Anderson v. Shipowners' Ass'n of Pac. Coast*, 272 U.S. 359, 362–63 (1926)). *See also Robinson*, 172 F.4th at 289. While the NCAA directs the Court to a contrary Ninth Circuit decision, *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1066 (9th Cir. 2015), *O'Bannon* does not persuade, given the Ninth Circuit failed to contend with the labor market—and thus Sherman Act—implications that the Rule and its implementation raise in this case.

Having established that the Rule is commercial in nature, the "only question left is whether that restraint is an unreasonable restraint on trade." *Elad*, 160 F.4th at 415.

### b. Rule of Reason

Recall that Section 1 of the Sherman Act prohibits undue commercial restraints on trade. *See, e.g., Alston*, 594 U.S. at 81. Determining whether any commercial restraint is *undue* "presumptively calls for . . . a 'rule of reason' analysis." *Id.* (citation modified). *See also Robinson*, 172 F.4th at 290. The parties agree that Plaintiffs' claims should be analyzed under the Sherman Act's rule of reason's "three-step, burden-shifting framework." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). *See also* ECF No. 19-1 at 16; ECF No. 32 at 11. But at the "inception" of any "rule-of-reason analysis," *Elad*, 160 F.4th at 416, courts must "adequately define the relevant market," *id. See also American Express*, 585 U.S. at 543 ("[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market."); *Pavia v. Nat'l Collegiate Athletic*

*Ass'n*, 154 F.4th 407, 416 (6th Cir. 2025) ("[A]nalysis of anticompetitive and procompetitive effects—the key to many antitrust cases—relies on market definition.") (Thapar, J., concurring).

Mindful of this order of operations, the Court first analyzes the relevant market and market definition. *See American Express*, 585 U.S. at 543. It then analyzes Plaintiffs' claims under the rule of reason's three-step framework.

### i.    Market Definition

The NCAA argues that Plaintiffs have failed to "offer antitrust evidence of a relevant market," ECF No. 32 at 12 (citation modified), and that this failure dooms their request for injunctive relief. Plaintiffs argue the "relevant market is the labor market for Division I college athletes," ECF No. 19-1 at 17, and counter that they have put forth sufficient *market definition* evidence, *see* ECF No. 35 at 9. The Court agrees with Plaintiffs.

The issue of *market definition* imposes two burdens. *First*, antitrust plaintiffs must put forth sufficient evidence of the relevant market. *See Robinson*, 172 F.4th at 293; *Tarabishi v. McAlester Reg'l Hosp.*, 951 F.2d 1558, 1569 n.15 (10th Cir. 1991). The "relevant market" is defined in terms of product, or labor, and geography. *See Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1024 (10th Cir. 2002). "In the labor market context . . . the market is comprised of those employers seen by workers as reasonably good substitutes." *Fourqurean*, 143 F.4th at 869. *See also United States v. E. I. du Pont de Nemours & Co.,* 351 U.S. 377, 395 (1956) (observing that "[i]n considering what is the relevant market . . . no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of

21

the trade or commerce', monopolization of which may be illegal" (citation modified)).[13]

*Second*, courts must themselves make "factual findings regarding the market." *Robinson*, 172 F.4th at 294. *See also Elad*, 160 F.4th at 416.

The NCAA shows familiarity with *market definition* disputes arising in substantially similar antitrust cases, citing several where courts have denied plaintiffs relief due to their failures to meet their evidentiary burdens. *See, e.g.,* ECF No. 32 at 13; *Robinson*, 172 F.4th at 294–95 (declining to specify "the exact quantity of evidence required for an antitrust plaintiff to meet their burden of proof to establish market definition" but "holding that [plaintiffs] presented no factual evidence here and therefore clearly failed to meet their burden of proof"). According to the NCAA, those cases highlight the need for "economic evidence based on current market realities," ECF No. 32 at 13 (citation modified), and Plaintiffs have offered no such evidence. The Court disagrees.

Plaintiffs offer the declaration of Dr. David Berri as evidence that supports their definition of the labor market for Division I college athletes. *See* ECF No. 19-1 at 17; *see generally* ECF No. 19-3. Dr. Berri has published numerous scholarly articles and books on sports and economics. *See, e.g., id.* at ¶¶ 4–5. He opines that "Division I college sports are a unique labor market [and] distinct from other college divisions, minor league professional sports, and major league professional sports." *Id.* at ¶ 12. In his declaration,

---

[13] Plaintiffs may bring Section 1 claims under the Sherman Act targeting monopolies, *see, e.g., id.*, but may also bring Section 1 claims to challenge market abuse on the buyer side. *See Todd v. Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2001) ("The Sherman Act, however, also applies to abuse of market power on the buyer side—often taking the form of monopsony or oligopsony." (citation modified)). Plaintiffs' Section 1 challenge is to the NCAA's alleged anticompetitive monopsony. *See* ECF No. 19-1 at 7. In such a case, a "market is comprised of buyers who are seen by sellers as being reasonably good substitutes." *Todd*, 275 F.3d at 202 (citation modified)).

Dr. Berri offers evidence in support of this opinion that adequately considers the "market realities for college sports," *Fourqurean*, 143 F.4th at 870, and that includes "cold, hard data," *Pavia*, 154 F.4th at 417 (Thapar, J., concurring), for the Court's consideration.

Dr. Berri provides evidence of average school revenue from 2025 in the NCAA. *See* ECF No. 19-3 at 9. This revenue evidence demonstrates the significant gap in the average revenue between NCAA Division I classifications—which subdivide NCAA Division I schools into, for example, those that "compete in Division I men's basketball (the highest rank of men's college basketball) but do not compete in the highest rank of college football"—and Division II or Division III schools, as well as NAIA and NJCAA schools. *Id.* at ¶ 24. NCAA Division I classifications generated average revenues in 2025 ranging from $117,862,762 to $25,056,231. *See id.* Whereas other Divisions, conferences, or associations generated *at most* $9,470,204 in average revenue, as was the case for the 156 NCAA Division II schools with football teams. *See id.* Expense data, as Dr. Berri observes, tells a "similar story," insofar as spending and revenue are concentrated among NCAA Division I schools across average revenue data collected by in the Education Department's Equity in Athletics Data Analysis. *Id.* at ¶ 26. This revenue data—from 2025—is certainly "economic evidence," *Pavia*, 154 F.4th at 417 (Thapar, J., concurring), that enables the Court to conduct its own analysis of contemporary market realities. Thus, Plaintiffs have already distinguished themselves from *Robinson*'s plaintiffs, who, in the words of the Fourth Circuit, "presented *no* factual evidence." 172 F.4th at 295 (emphasis added). And the Supreme Court has endorsed precisely this type of revenue evidence in analyzing market definitions under the Sherman Act. *See Int'l*

*Boxing Club of N. Y., Inc. v. United States*, 358 U.S. 242, 250 (1959) ("[T]he lower court . . . found that there exists a 'separate, identifiable market' for championship boxing contests. This general finding is supported by detailed findings to the effect that the average revenue from all sources for appellants' championship bouts was $154,000, compared to $40,000 for their nonchampionship programs." (citation modified)).

Dr. Berri offers similar evidence regarding attendance differences between NCAA Division I basketball games, and attendance at games in other Divisions, for the 2024–25 season. *See* ECF No. 19-3 at ¶ 28. From this empirical evidence, drawn from an NCAA attendance report, Dr. Berri opines that attendance at NCAA Division I basketball events exceeds attendance for Division II and Division III events significantly. *See id.* at ¶¶ 30–31 ("All [Division I] conferences—except the Northeast Conference—average at least 1,000 fans per game in 2024–25. When we look at Division II, only [the] Mid-America Intercollegiate conference could average at least 1,000 fans per game. The average for that conference was 1,041, a mark below what every Division I conference was able to achieve in 2023–24 . . . . There is no conference in Division III that averaged 1,000 fans per game." (citation modified)). Dr. Berri provides a similar analysis of men's college football attendance from 2021–25. *See id.* at 13. This evidence also provides support for Plaintiffs' *market definition* arguments. *See, e.g., Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1166 (D. Nev. 2016) ("To find whether the Plaintiffs defined a relevant market within a sport, therefore, the Court must take into consideration how athletes in their respective fields are ranked with regards to one another."); *International Boxing Club of New York*,

24

358 U.S. at 250 (also considering "the average 'Nielsen' ratings over a two-and-one-half-year period" in *market definition* analysis).

Dr. Berri not only provides empirical evidence demonstrating how Division I athletics are distinct from their Division II and Division III counterparts, Dr. Berri also marshals evidence demonstrating that the "Division I labor market is distinct from professional sports." ECF No. 19-3 at 13. Attendance varies significantly from NCAA Division I basketball events, NBA events, and events with the NBA's minor basketball league, "the G-League." *Id.* at ¶ 34. From a performance perspective, "players in the Division I conferences with lower attendance are typically not good enough to play in the G-League [and so] this is not a choice for them." *Id.* at ¶ 35. Dr. Berri provides a succinct explanation:

> [The G-League] has much better basketball players than most men's college basketball teams. But the G-League has never found an audience at the gate or on television. This is because the G-League is not "best in class." Its labor pool is the same as the NBA (*i.e.* "adult men who play basketball").

> College sports are different. College sports is a competition between students attending college. The class *is* college students. So, when Ohio State University plays the University of Michigan in a sport, it attracts an audience because these two institutions are generally thought of as "best in class."

ECF No. 19-3 at ¶¶ 41–42. This explains attendance differentials between Division I and G-League events, and underscores why the G-League is *not* a substitute for Division I athletics. *See id.* at ¶ 43. Plaintiff Loosli's declaration bolsters this point. *See* ECF No. 19-5 at ¶ 8 ("[T]he increased exposure would also bring me closer to *fulfilling my dream* of playing Major League Baseball." (citation modified)).

As for the NBA, draft evidence demonstrates why the NBA is likewise not a substitute for Division I athletics. Drawing from draft statistics from 2006 through 2025, and citing *Alston*, *see* ECF No. 19-3 at ¶ 48, Dr. Berri demonstrates that under contemporary market realities "players could now be paid substantially more to play college sports," *id.*, which instructively guides how to think about cross-price elasticity between playing Division I college basketball and playing professional basketball in the NBA. *See also Todd*, 275 F.3d at 202 (observing in buyer-side antitrust challenges that "the proper focus is [on] the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers" (citation modified)). As Dr. Berri observes, if the NBA and Division I athletics are substitute labor markets, "we should see [that] when the wage increases in college the number of college players choosing to go to the NBA should decline." ECF No. 19-3 at ¶ 49.

But the record does not bear this expectation. Although there is no precise data yet as to specific NIL payments for Division I athletes, *see id.* at ¶ 50, despite the known *availability* and *disbursement* of NIL payments to Division I athletes, there is no decline in NBA draft enrollment, *see id.* at ¶ 51. In fact, it appears that moving from 2016–20 into 2021–25, once Division I wages, through NIL payments, increased, there was nonetheless an increase in the number of first-year players selected in the NBA draft, *see id.* And sensibly so: "Even if players can earn substantial NIL or revenue sharing payment in college, the NBA would still eventually pay *immensely more.*" *Id.* (emphasis added). *See also* ECF No. 19-5 at ¶ 8.

26

Dr. Berri analyzed the same issue in the baseball context, where draft data—which includes data following *Alston*—tells a similar story. Essentially, despite the increase in NIL payments and their availability for Division I athletes, in 2022–25 relative to 2016–19 "a higher percentage [of players drafted out of four-year colleges] chose to go play minor league baseball after NIL was instituted." *Id.* at ¶ 59. And as for MLB, "[e]ven if NIL payments are quite large, they do not compare to payments in Major Leage Baseball." *Id.* at ¶ 62.

The NCAA resists Dr. Berri's declaration as adequate evidence, as well as the evidence that Dr. Berri marshals in providing it. *See* ECF No. 32 at 13. According to the NCAA, Dr. Berri improperly "suggest[s] that all Division I sports are part of the same market, [and therefore that] all Division I sports are interchangeable for each other." *Id. See also* ECF No. 32-3 at ¶ 45. However, Dr. Berri does not suggest all Division I sports are interchangeable. Instead, his declaration is evidence that for NCAA Division I sports the NCAA is the sole "buyer" for all athletes in the "submarkets" of individual sports. *See, e.g.,* ECF No. 35-1 at ¶ 21.[14] Dr. Berri opines, and provides evidence in support of, the proposition that Division I athletics constitute a *distinct labor market* from any other divisional (e.g., Divisions II and III) or professional counterpart (e.g., the NBA or MLB) for Division I athletes. In other words, evidence that other divisions or associations do not

---

[14] Plaintiffs' own declarations highlight this. Plaintiffs compete in a wide range of sporting events, yet there is absolutely no indication that they have any suitable substitute for continuing to play if they are barred from a fifth season under the Rule and its implementation. Nor do they regularly compete in sporting events outside of Division I or the NCAA itself. *Cf. Shields v. World Aquatics*, No. 23-15092, 2024 WL 4211477, at *3 (9th Cir. Sept. 17, 2024) (concluding plaintiffs did not create dispute of material fact regarding market definition where "top-tier professional swimmers, including the swimmer plaintiffs, frequently compete in a wide variety of non-affiliated events").

27

constitute "good substitutes" for Division I athletics. *Todd*, 275 F.3d at 202 (citation modified).[15] Regardless, at this stage Plaintiffs are not required to, for instance, offer evidence about every single Division I sport's revenue or attendance for the Court to make its own findings as to the relevant market. Instead, Plaintiffs have, as they must, put forth statements from Dr. Berri that are "based on specific facts pertaining to the proposed market"—i.e., NCAA Division I athletics. *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 223 F. Supp. 2d 718, 727 (D. Md. 2002), *aff'd sub nom. Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576 (4th Cir. 2003).

The NCAA's related observation that there are alternative markets, such as the NBA and Europeans Leagues, *see* ECF No. 32 at 14, does not undermine Dr. Berri's analysis. The point is not that there are no alternative markets. The point is that, as a function of market realities—and as a doctrinal antitrust matter—alternative markets such as professional leagues are insufficient substitutes for Division I athletics. *See, e.g., Todd*, 275 F.3d at 202; *Fourqurean*, 143 F.4th at 869. (And they are.)

Dr. Backus makes this same point as the NCAA, and goes further in criticizing Dr. Berri's methodology. *See, e.g.,* ECF No. 32-3 at ¶ 49 ("Attendance data does not show substitutability in the labor market."); *id.* at ¶ 51 ("Again [Dr. Berri] declines to employ standard tools of antitrust analysis in his analysis of market definition."). *See also* ECF

---

[15] The NCAA's competing industrial organization economist, Dr. Matthew Backus, appears at times to engage in speculation without himself offering quantitative support: "The most talented basketball players, who *may* have the largest NIL deals, *may* face a choice of whether to enter the NBA draft at any point after they are eligible . . . to go to an international league, the G-league or to continue and earn NIL or revenue sharing in the NCAA." ECF No. 32-3 at ¶ 45 (emphasis added). *See also id.* at ¶ 60 ("I have not conducted a fulsome market definition analysis, but these data and analyses are *suggestive* of different margins of substitution . . . ." (citation modified)).

No. 32 at 15. However, as noted above the Supreme Court has considered exactly the type of evidence marshalled by Dr. Berri in its own *market definition* analysis. *See Int'l Boxing Club*, 358 U.S. at 250–51. And as for the soundness of Dr. Berri's methodology and underlying evidence, Dr. Backus fails to persuade that the sources from which Dr. Berri presented his data and drafted his evidentiary tables are so "incomplete" as to discredit his elasticity conclusions. *Cf.* ECF No. 32-3 at ¶ 57. For instance, the Court is not persuaded that Dr. Berri's failure to access comprehensive NIL wage information undermines his elasticity conclusions regarding the Division I market relative to the NBA, particularly where Dr. Backus himself provides salary data for professional athletes that tends to *support* Dr. Berri's conclusion as to the material disparity between compensation despite post-*Alston* NIL payments Division I athletes may receive. *Compare id.* at 30, *with* ECF No. 19-3 at ¶ 51.[16]

Moreover, Dr. Backus and the NCAA do not persuade that Dr. Berri's was "hid[ing] the trends" of underclassmen selected in the NBA draft, ECF NO. 32-3 at ¶ 58, that would otherwise undermine his analysis, particularly where Dr. Backus's challenge is itself suggestive—"*indicating* more substitution between the NBA and Division I men's

---

[16] The NCAA faults Dr. Berri for not considering NIL data from the 2025–26 academic year in his analysis. *See* ECF No. 32 at 14. The Court declines to fault Dr. Berri for failing to consider data that he represents was unavailable at the time he prepared his declaration. *See* ECF No. 19-3 at ¶ 50. Regardless, Dr. Berri proceeded from the premise that such NIL wage increases occurred in his own analysis. *See id.* This satisfies the Court that Dr. Berri adequately considered a feature of the current market reality, *cf.* ECF No. 32 at 14, that does not demand discounting of his opinions and evidence. As indicated above, much of Dr. Berri's declaration provides data up to 2025, which certainly accommodates for market realities post-*Alston*. *Cf. Fourqurean*, 143 F.4th at 870 ("The market realities for college sports have changed in the four years since *Alston*.").

basketball"—without providing more than a chart from "RealGM.com" in support of this

proposition. And Dr. Berri rebutted this contention in his reply declaration, explaining that

> From 2006 to 2025, 83.3% of players selected in the NBA first round were underclassmen. That did not markedly change in 2026. 79% of those selected out of college in the first round in 2026 were also underclassmen. So, there is very little change in the first round of the NBA. It is still the case that about 80% of those chosen out of college are still underclassmen.

ECF No. 35-1 at ¶ 18.[17]

* * *

There are three basic perspectives that inform the Court's *market definition*

analysis. The first emerges from recent cases concerning NCAA eligibility rules. The

perspective—a doctrinal principle, really—gleaned from these cases contemplates that

Plaintiffs cannot simply presume a market definition. Instead, they must offer actual

evidence of their proposed market.

The second emerges from Plaintiffs in this case. They have a grasp of these cases,

and say that, bearing their dispositions in mind, *this* case is different. They have put forth

specific, empirical evidence of their market that withstands scrutiny.

The third emerges from the NCAA. The NCAA believes that these recent cases

create an impassable hurdle. Under them, Plaintiffs cannot meet their *market definition*

burden—*despite* the evidence that Plaintiffs have put forward.

---

[17] The Court notes that, from a Rule 702 or *Daubert* perspective, it has not certified either Dr. Berri or Dr. Backus as an expert. At this procedural stage, the Court has simply considered both of their competing declarations and evidentiary submissions in concluding Plaintiffs have met their *market definition* burden. *Cf. Robinson*, 172 F.4th at 294 (concluding district court erred when it did not consider "parties' differing opinions on the [relevant market] topic and instead merely adopted the [plaintiffs'] proffered definition").

The Court agrees with Plaintiffs. They have defined their market as the labor market for Division I college athletes. *See* ECF No. 19-1 at 17. This provides the Court with an understanding of the "product market"—labor—and the "geographic market"—Division I athletics in the United States. *See Lantec, Inc.*, 306 F.3d at 1024; *2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*, 809 F. Supp. 3d 371, 379 (W.D.N.C. 2025) (concluding that "geographic scope of the relevant market, which [was] the United States," satisfied *market definition* requirement); *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 592 (N.D.W. Va. 2023).[18] In defining this market, Plaintiffs have made specific reference, through Dr. Berri and quantitative data in his declaration, to the "reasonable interchangeability of use or the cross-elasticity of demand between" NCAA Division I athletics and divisional or professional substitutes. *Christou v. Beatport, LLC*, 849 F. Supp. 2d 1055, 1065 (D. Colo. 2012) (citation modified). *See also E.I. du Pont*, 351 U.S. at 395. Further, Dr. Berri's declaration provides evidence in the form of "cold, hard data" that "grapple[s] with recent changes" in the relevant market, *Pavia*, 154 F.4th at 417 (Thapar, J., concurring), including how market realities have changed since *Alston*, *see Fourqurean*, 143 F.4th at 870. *Cf. Robinson*, 172 F.4th at 295 (holding plaintiffs did not met *market definition* burden of proof where they "presented *no* factual evidence" of market definition). And Dr. Berri did not "exclusively rel[y] on *Alston* to define the relevant

---

[18] To the extent elaboration on the *geographic market* requirement is necessary, a geographic market "includes the geographic area in which consumers can practically seek alternative sources of the product, and it can be defined as 'the market area in which the seller operates.'" *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) (citation modified). The same reasoning applies in a buyer-side antitrust challenge, insofar as the *geographic market* is the area in which the buyer operates. *See Todd*, 275 F.3d at 202. And the NCAA undoubtedly operates nationwide, underscoring that the geographic market, which Plaintiffs have met their burden of showing, is the United States.

market," or fail to cite "[any] market evidence or economic data" in his declaration. *Elad*, 160 F.4th at 416. To the contrary: Dr. Berri put forth evidence from which he drew his own conclusions, which themselves serve as *market definition* evidence.

Not only is this evidence current and empirical, it sufficiently demonstrates at this procedural stage that there are no "good substitutes," *Todd*, 275 F.3d at 202, for Division I athletics. Plaintiffs have shown that there is no "commonality [or] interchangeability," *id.*, between Division I athletics, and other NCAA Divisions, or professional leagues for Division I sports. *See also American Express*, 585 U.S. at 543 ("The relevant market is defined as the area of effective competition. Typically, this is the arena within which significant substitution in consumption or production occurs." (citation modified)). As indicated above, Dr. Berri identified evidence that may be considered in any *market definition* analysis, including revenue and attendance data. *See Int'l Boxing Club of N. Y.*, 358 U.S. at 250–51. Dr. Berri's conclusions are bolstered by evidence of a statement made by Charlie Barker, the current NCAA president, that "98% of the 550,000 NCAA student-athletes will go pro in something other than sports," ECF No. 19-3 at ¶ 11, underscoring that the NCAA Division I labor market is unique. *See Todd*, 275 F.3d at 205 ("Industry recognition is well established as a factor that courts consider in defining a market. It is significant because we assume that the economic actors usually have accurate perceptions of economic realities." (citation modified)).

Having considered the parties' arguments and evidentiary submissions, and consistent with the above analysis, the Court finds that, based on the preliminary injunction record, Plaintiffs have met their *market definition* burden. *See Robinson*, 172

F.4th at 294; *Elad*, 160 F.4th at 416. There is a defined, unique labor market for Division I athletics. Evidence of contemporary market realities supports this finding. Accordingly, the Court proceeds to its rule of reason analysis. *See American Express*, 585 U.S. at 543; *Pavia*, 154 F.4th at 416 (6th Cir. 2025)  (Thapar, J., concurring).

### ii.    Substantial, Anticompetitive Effect

Applying the rule of reason, Plaintiffs bear the initial burden to "prove that the challenged restraint"—the Rule—"has a substantial anticompetitive effect." *Alston*, 594 U.S. at 96 (citation modified). *See also L. v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1017 (10th Cir. 1998) ("A rule of reason analysis first requires a determination of whether the challenged restraint has a substantially adverse effect on competition." (citation modified)). Regarding anticompetitive effects, the "reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." *Robinson*, 172 F.4th at 292 (citation modified)). Plaintiffs may meet their step one, *anticompetitive effect* burden with indirect evidence. *See American Express*, 585 U.S. at 542 ("Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." (citation modified)).[19]

Plaintiffs argue the Rule and its implementation will "harm athletes in the relevant labor market for Division I college athletics," ECF No. 19-1 at 18, by "limiting the eligibility

---

[19] It can hardly be disputed that the NCAA has the requisite *market power*. *See, e.g., Alston*, 594 U.S. at 109 ("The NCAA acknowledges that it controls the market for college athletes.") (Kavanaugh, J., concurring); *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 762 (E.D. Tenn. 2024) ("The NCAA's market power over Division I athletics is undeniable." (citation modified)). Recall the definition of *monopsony*: "Monopsony is defined as a 'market situation in which there is a single buyer or a group of buyers making joint decisions.'" *United States v. Syufy Enters.*, 903 F.2d 659, 663 n.4 (9th Cir. 1990) (citation modified)).

of the entirety of the class of 2022" from competing in a fifth season, *id.* at 19. In other words, that by "removing this entire class from the labor market, the NCAA is . . . restricting competition within the labor market." *Id.* The NCAA argues that Plaintiffs have offered no evidence of anticompetitive effects to meet their step one burden. *See* ECF No. 32 at 16. The NCAA further argues that there is "no plausible harm to output," *id.* at 17, given the roster caps in effect, and that the Rule will not "decrease price in the alleged market," *id.* The Court rejects the NCAA's arguments and agrees with Plaintiffs that they have met their first step burden.

As Plaintiffs observe, evidence in the record contradicts the NCAA's argument that roster caps neutralize any anticompetitive effects. *See* ECF No. 35 at 10. Regarding caps and "harms to output," evidence indicates in the 2024–25 season, the latest season with available data regarding participations and roster caps, that: in every NCAA Division I men's sport that there were teams that report fewer participants than the applicable cap; on average, "55% of women's sports teams are below the corresponding cap in the sport"; on average, "23% of men's sports teams are below the corresponding cap in the sport"; and across teams this season "there were thousands of spots below the caps." ECF No. 35-1 at ¶ 6. Further, evidence that the NCAA offers regarding roster caps is itself lacking empirical support: "Plaintiffs' slots in many sports would be easily filled because of the limited annual number of NCAA Division I roster slots available and the multitude of newly-graduated high school student-athletes hoping for an opportunity." ECF No. 32-3 at ¶

34

78.[20] And Dr. Backus's contention—an echo of one made by the NCAA throughout its brief—that a "finding for the Plaintiffs would deprive others of those [athletic] opportunities," *id.* at ¶ 79, proceeds from the premise that each roster is at maximum capacity. The NCAA has put forth no evidence of this, and Plaintiffs have put forth evidence to the contrary. Moreover, as Plaintiffs observe, the number of athletes in college sports would *increase* if, given that it appears many teams have not met their roster caps, Plaintiffs and class members were allowed to compete for a fifth season. *See* ECF No. 35 at 11.

The same is true regarding the NCAA's "overall wages" argument. ECF No. 32 at 17. While the *House* settlement imposes a revenue-sharing cap, *see* ECF No. 35-1 at ¶ 9, third-party NIL money "on top of [it]," ECF No. 35 at 11, is not capped. Thus, it stands to reason that by removing labor restraints on Plaintiffs and similarly situated Division I athletes, the "pool of NIL money may continue to increase." ECF No. 35 at 11 n.9. In other words, the NCAA cannot categorically argue that "overall wages *will not* increase if Plaintiffs are allowed to return to competition." ECF No. 32 at 17 (citation modified).[21] The

---

[20] While Dr. Backus goes on to cite certain statistics regarding the number of participants in NCAA Division I football from 2024 relative to the number of high school football players from the 2023–24 season, *see* ECF No. 32-2 at 48 n.72, the conclusion that Dr. Backus draws from these statistics does not attend whether Division I teams are *actually* meeting their roster caps. It may be the case that there are "250,000 potential candidates," *id.*, for NCAA Division I football positions. But notably, Dr. Backus does not specify which of these meet NCAA Division I eligibility requirements. *See id.* (arguing that "some percentage" may meet eligibility requirements). But continuing to give Dr. Backus's analysis the benefit of the doubt, his analysis still fails to connect the input quantity of potentially eligible student-athletes to how or why certain teams as recently as 2024 are not meeting their roster caps.

[21] The NCAA suggests that the Seventh Circuit had something to say on this point. *See* ECF No. 32 at 17. But to the extent the Seventh Circuit in *Fourqurean* offered any pronouncement about "ordinary principles of supply and demand," 143 F.4th at 871, this was hedged: "Under ordinary principles of supply and demand, a restraint that limits the supply of workers in a labor market would increase, not decrease, worker compensation.* The Five-Year Rule may operate differently, but the record contains *no evidence* that would allow us to draw that conclusion." *Id.* (emphasis added).

Rule and its implementation actually have an identifiable effect on the market—reducing the number of eligible Division I athletes who may generate uncapped NIL wages. In other words, reducing the amount of money that can center the NCAA Division I labor market.

For these reasons, the Court agrees with Plaintiffs that they have met their first step burden of showing that the Rule and its implementation have substantial, anticompetitive effects. They have put forward evidence showing that the Rule will reduce output, decrease wages, and decrease quality (i.e., the number of qualified, seasoned athletes) in the relevant market. *Cf. Robinson*, 172 F.4th at 292; *Ohio*, 706 F. Supp. 3d at 593 (concluding that plaintiffs met first step burden where transfer eligibility rule would "harm [a plaintiff's] ability to play football, earn NIL money, his mental health, and the possibility to play professional football").[22] And the Rule will have these effects on "competition as a whole within the relevant market," *Robinson*, 172 F.4th at 292, insofar as that the Rule will affect Plaintiffs and class members directly by excluding them from the market but will also *harm competition* within the entire market for the same reason, *see American Express*, 585 U.S. at 542. *See also Tennessee*, 718 F. Supp. 3d at 762 ("Plaintiffs also present sufficient evidence that the challenged rules likely harm competition."); *Braham v. Nat'l Collegiate Athletic Ass'n*, 794 F. Supp. 3d 824, 835 (D. Nev. 2025) ("[T]he Five-Year Rule harms competition in the relevant market by excluding a qualified cohort—namely, [junior college] athletes."). In other words, competition among the market is harmed when Plaintiffs and class members are prohibited from even being

---

[22] The Court reiterates that the quality of Plaintiffs' evidentiary submissions render many cases that might otherwise appear fatal to their request for injunctive relief inapposite. *See, e.g., Coley v. Nat'l Collegiate Athletic Ass'n*, 792 F. Supp. 3d 634, 647 (E.D.N.C. 2025) ("[Plaintiff], however, did not offer *any expert economic analyses* or provide any market-wide data for the court's consideration." (emphasis added)).

36

eligible to compete for a fifth season, which can further depress uncapped NIL wages. *See also id.* ("[T]he Five-Year Rule's undue restraint on competition harms commerce, where 'commerce,' under the present circumstances, encompasses the opportunity for [junior college] athletes to compete for NIL compensation."). Therefore, Plaintiffs have offered sufficient indirect evidence of substantial, anticompetitive effects at this step of the Court's *rule of reason* analysis.[23]

### iii.    Procompetitive Rationale

The burden now shifts to the NCAA to set forth a "procompetitive rationale" for its restraint (which is to say, the Rule). *Alston*, 594 U.S. at 96 (citation modified). The NCAA may meet its burden by showing that such rationale, or rationales, "justify the anticompetitive effects." *L.*, 134 F.3d at 1021 (citation modified)). *See also Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1306 (10th Cir. 2017) ("[C]ourts . . . determine whether any such harm is nonetheless justified by countervailing procompetitive benefits." (citation modified)); *Alston*, 594 U.S. at 99 ("[A]t step two the

---

[23] The Court has analyzed Plaintiffs' evidence and arguments under an *indirect evidence* framework, given that they proceed under such a theory. *See* ECF No. 19-1 at 17 ("The substantial anticompetitive effect of the implementation of the Five-Year Eligibility Rule is obvious from evaluation of indirect evidence."). But at least one court has concluded eligibility rules may amount to *direct evidence* of anticompetitive effects. *See Ortega v. Nat'l Collegiate Athletic Ass'n*, No. 4:25–cv–00496–RGE–SBJ, 2026 WL 1847877, at *7 (S.D. Iowa Apr. 23, 2026) ("The five-year rule does operate to prohibit NCAA member institutions from entering into labor contracts with an indeterminate subset of wrestlers who those institutions would otherwise seek to employ. Therefore, direct evidence exists that the five-year rule has detrimental economic effects on all wrestlers the five-year rule excludes from the wrestling labor market."). Interestingly, the NCAA's argument implicitly concedes this point: By arguing that the Rule "shifts who enjoys the benefits of participation from one group to another," ECF No. 32 at 17, the NCAA implies that a member institution must *shift* the athlete with whom it might otherwise enter into a labor contract, even if it would not otherwise want to do so. The Court does not rest its *anticompetitive effects* analysis on this theory because Plaintiffs did not urge the Court to do so. *See Greenlaw v. United States*, 554 U.S. 237, 243 (2008). However, the notion that a member institution would be *required* to "shift" the players with whom it wants to enter into labor contracts— perhaps against its own interests—could amount to proof of "actual detrimental effects on competition," *American Express*, 585 U.S. at 542 (citation modified), that not only bolsters the Court's *indirect evidence* conclusion but could also independently serve as *direct evidence* of anticompetitive effects.

NCAA had to show only that those same rules collectively yield a procompetitive benefit." (citation modified)).

The NCAA says it has met its burden because the Rule has procompetitive benefits. *See* ECF No. 32 at 17. Specifically, that eligibility rules, including the Rule, "preserve for high school students the ability to participate" in Division I sports by creating a "corresponding exiting class of graduates to open up opportunities." *Id.* at 18. Moreover, eligibility rules are procompetitive because they "expand output by creating and preserving the unique offerings of [Division I] athletics." *Id.* As for the Rule's implementation, the NCAA argues that the Rule protects the "reliance interests" of "thousands" of student athletes entering the 2026–27 season, who have relied on roster spots being "fixed" for the season. *Id.* Plaintiffs challenge this rationale, arguing that the NCAA's argument is fundamentally *equitable*, not *procompetitive*, in nature. *See* ECF No. 35 at 12. The Court agrees with Plaintiffs that the NCAA has not met its step two, *procompetitive justification* burden.

The NCAA's argument proceeds from a flawed premise: That *excluding* athletes from the labor market is actually procompetitive. In the NCAA's words, by "exiting" a class of Division I athletes, its eligibility rules "expand output." ECF No. 32 at 18. Its argument about the Rule specifically not only suffers this same flaw (and assumes that all rosters are zero-sum, which evidence in the preliminary injunction record contraindicates). *See id.* But antitrust law does not endorse—or sustain—this understanding of markets or market output. I.e., that *reducing* laborers in a market is somehow procompetitive. "[T]his justification runs afoul of the basic economic principle that greater competition in a labor

38

market generally leads to better outcomes for workers." *Martinson v. Nat'l Collegiate Athletic Ass'n*, 804 F. Supp. 3d 1109, 1130 (D. Nev. 2025) (citation modified).[24] And the Court shares *Martinson*'s concern that this rationale is an artificial attempt to "even the playing field" that "leads to lower wages for all workers." *Id. See also L.*, 134 F.3d at 1021 ("Justifications offered under the rule of reason may be considered only to the extent that they tend to show that, on balance, the challenged restraint *enhances competition*." (citation modified)); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 659 (2d Cir. 2015) ("While *introducing* [a product] may be procompetitive, that argument provides no procompetitive justification for *withdrawing* [another product]." (original emphasis)); *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 834 (6th Cir. 2011) (noting defendants can meet step two burden by demonstrating "some countervailing procompetitive virtue—such as, for example, the creation of efficiencies in the operation of a market or *the provision* of goods and services." (citation modified)).

Which leads the Court to Plaintiffs' argument that the NCAA's rationale is *equitable*, rather than procompetitive, in nature. *Alston* teaches that this line of thinking—that a restraint has an equitable or social benefit for a class of individuals, such as incoming Division I student-athletes—bears little relevance in an *antitrust* inquiry. 594 U.S. at 95 (observing the Court previously "refused to consider whether [a] restraint of trade served some social good more important than competition" and that the "social justifications proffered for respondents' restraint of trade do not make it any less unlawful"

---

[24] *Martinson* has been appealed to the Ninth Circuit. The Ninth Circuit has not yet issued an opinion as to the NCAA's appellate challenge to the district court's order granting plaintiff's preliminary injunction motion. Regardless, *Martinson*'s pending appeal does not disturb this fundamental principle that greater competition in a market is better for a market.

(citation modified)). This Court is bound by this instruction. *See Wallace*, 472 U.S. at 47 n.26. Whether granting Plaintiffs' request for relief would have "dire consequences" for other athletes purportedly "counting on roster spots," ECF No. 32 at 18, is thus of no moment for the Court's assessment of the NCAA's *procompetitive* rationales for the Rule and its implementation. *See also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 101 (1984) ("[G]ood motives will not validate an otherwise anticompetitive practice." (citation modified)); *F.T.C. v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 424 (1990) ("The statutory policy underlying the Sherman Act precludes inquiry into the question whether competition is good or bad." (citation modified)).[25]

Because the NCAA has not met its step two, *procompetitive rationales* burden, the Court's *rule of reason* analysis could conclude here—and conclude that Plaintiffs have shown a likelihood of success on the merits of their Section 1 claim. *See, e.g., O.M. by & through Moultrie v. Nat'l Women's Soccer League, LLC*, 541 F. Supp. 3d 1171, 1182 (D. Or. 2021) (concluding that defendant "failed to meet its burden of demonstrating a procompetitive rationale" for restraint and finding that plaintiff "ha[d] shown that the law and facts clearly favor her position that the "restraint violated Section 1 of the Sherman Act"). Yet for the sake of completeness, the Court proceeds to analyze the third *rule of reason* step, which is whether—presuming that the NCAA actually met its step two, *procompetitive* burden—Plaintiffs have shown the NCAA's proffered procompetitive

---

[25] For this same reason, the Court rejects Dr. Backus's challenge to Plaintiffs' evidentiary submissions, and the merits of Plaintiffs' claims, on the grounds that they "do not consider potential harm to student-athletes similar to Plaintiffs in the future or student-athletes who otherwise would have played on a Division I team . . . ." ECF No. 32-3 at ¶ 111. As a matter of antitrust doctrine, this emphasis on how other student-athletes will themselves be affected is too narrow, when the Court is instead tasked with assessing how the NCAA's conduct has or will affect competition in the market that Plaintiffs have sufficiently defined.

rationales could be achieved through less anticompetitive means. *See, e.g., O.M.*, 541 F. Supp. 3d at 1182.

### iv.     Less Restrictive Means

Presuming the NCAA has met its *procompetitive effects* burden, Plaintiffs must now show that "the challenged conduct is not reasonably necessary to achieve the legitimate objectives or that those objectives can be achieved in a substantially less restrictive manner." *L.*, 134 F.3d at 1019 (citation modified). *See also Alston*, 594 U.S. at 100 (observing that plaintiffs met third step burden where "they were able to show that the NCAA could achieve the procompetitive benefits it had established with substantially less restrictive restraints").[26]

The Court begins with the NCAA's argument that Plaintiffs cannot meet their *less restrictive* means burden because the "zero-sum nature of athletics" means the NCAA cannot simultaneously "take away opportunities from incoming high school students" by

---

[26] Regarding this third step standard, the Court notes a tension between *Alston* and *American Express*. *Alston* contemplates "substantially less restrictive restraints." *Id.* Contra *American Express*: "If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved *through less anticompetitive means*." 585 U.S. at 542 (citation modified). Absent from *American Express*'s plain language is *Alston*'s elevated, "substantially less" requirement. Compounding this tension is *Alston*'s citation to *American Express* in discussing and articulating its "substantially less restrictive means" standard. *See* 594 U.S. at 100. The Tenth Circuit has likewise oscillated in its articulation of this third step standard. *Compare Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1310 (10th Cir. 2017) ("[T]he plaintiff then must prove that the challenged conduct is not reasonably necessary to achieve the legitimate objectives or that those objectives can be achieved in a substantially less restrictive manner." (citation modified)), *with Suture Express, Inc. v. Owens & Minor Distribution, Inc.*, 851 F.3d 1029, 1038 (10th Cir. 2017) ("[T]he burden then shifts back to the plaintiff to rebut the defense by showing either that the proffered justification is illegitimate, that the challenged conduct is not necessary to achieve the legitimate objectives, or that the objectives can be achieved by other means that negatively affect competition far less." (citation modified)). The Court is in no institutional position to resolve this matter. Regardless, as explained further below—again, proceeding for the sake of completeness in its *rule of reason* analysis—Plaintiffs have met their burden under the "substantially less" standard, *see Alston*, 594 U.S. at 100, and for this reason Plaintiffs have also met their burden under less stringent standard set forth in *American Express* and *Suture Express*.

permitting athletes like Plaintiffs to compete while also affording incoming students "meaningful opportunities to compete" by excluding athletes like Plaintiffs from a fifth season of play. ECF No. 32 at 19. The NCAA bolsters this singular argument with *Alston*'s observation that judicial officers must give a "wide berth" to entities' "business judgments" before finding antitrust liability. *Id.* (citing *Alston*, 594 U.S. at 102). According to the NCAA, Plaintiffs' request—*let us play a fifth season of college sports*—is tantamount to a request to "abandon those principles" by "second-guess[ing]" the NCAA's "considered judgment." *Id.*[27]

Plaintiffs see the world much more practically and simply. They want to be treated like all other athletes under the Rule, which is to say they want to be eligible for a fifth season of competitive play. *See* ECF No. 19-1 at 21 ("Having chosen five seasons of eligibility for everyone else, the NCAA cannot now claim that extending the same rule to Plaintiffs is unjustifiable or harmful to competition."). And they identify a practical alternative to achieving their goal that would be entirely consistent with the Rule: granting

---

[27] The NCAA opens its merits arguments with an extended discussion of *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1198 (10th Cir. 2009), which, according to the NCAA, is "directly contrary" and thus forecloses Plaintiffs' entire case. ECF No. 32 at 10. But *Christy Sports*'s recitation of basic antitrust principles, coupled with material procedural and factual distinctions, show how this argument stumbles out of the gate. The notion that "antitrust laws should not be allowed to stifle a business's ability to experiment in how it operates, nor forbid it to change course upon discovering a preferable path" is, frankly, uncontroversial. *Christy Sports*, 555 F.3d at 1198. But explained above, this notion does not swallow antitrust laws, nor does it forbid courts from analyzing any plaintiff's claim on the merits under the rule of reason in determining whether a business's "experiments," *see id.*, are anticompetitive. As for *Christy Sports*'s procedural background, it concerned only appellate review of a district court's dismissal of claims under Section 2 of the Sherman Act regarding a challenge to an alleged monopoly. *See id.* at 1191. Central to *Christy Sports* was whether "the creator of a resort has [an] obligation under the antitrust laws to allow competitive suppliers of ancillary services on its property." *Id.* at 1193. The Tenth Circuit answered *no. See also id.* at 1196 ("[H]aving created a resort destination, antitrust will not force a resort developer to share its internal profit-making opportunities with competitors."). The NCAA fails to explain how a case decided against a different doctrinal backdrop, in a different procedural posture, and that concerned a distinguishable anticompetitive scheme is demands denial of Plaintiffs' motion.

42

them a waiver under the Rule for an additional year of eligibility, notwithstanding they are otherwise ineligible for such a year based on the year they graduated high school and the number of seasons in which they have competed so far. *See, e.g.,* ECF No. 19-1 at 22; ECF No. 35 at 13. The Court agrees with Plaintiffs that, based on the preliminary injunction record, they have met their third step, *substantially less restrictive means* burden. *See Alston*, 594 U.S. at 100.

Start with the NCAA's premise that its membership was bound with a zero-sum choice: include entirely or exclude entirely Plaintiffs and similarly situated student-athletes. *See* ECF No. 32 at 19 ("[T]hose outcomes cannot both be achieved."). But the NCAA's own evidentiary submission belies this *all or nothing* argument. As Mr. Silver stated in his affidavit: "The Five-Year Rule permits student-athletes to compete in up to four seasons of collegiate athletic competition during their five-year period of eligibility, which commences upon full-time enrollment at a collegiate institution. The period of eligibility contained in the Five-Year rule *can be extended* subject to various forms of waivers provided in the [NCAA] Bylaws, including *extension of eligibility waivers*, hardship waivers, season of competition waivers, and legislative relief waivers." ECF No. 32-1 at ¶ 15 (citation modified).[28] Any rule is hardly *all or nothing* when its implementing institution provides for numerous exceptions. As, in this case, Mr. Silver declared.

---

[28] The ability of the NCAA to administer waivers undermines the NCAA's *procompetitive effects* argument that granting Plaintiffs' their requested relief would make it "virtually impossible for the NCAA to ever change its rules and govern itself." ECF No. 32 at 18. So too does it undermine the NCAA's argument that granting Plaintiffs the relief they seek would be a "chaos-causing step," ECF No. 32 at 3, since the record indicates the NCAA has, and may continue to, dispense eligibility waivers in any number of circumstances.

43

Plaintiffs' proposed waivers, whose administration appear entirely possible and feasible under the NCAA's current Bylaws, would "eliminate the anticompetitive harm" that Plaintiffs and class members face under the Rule's impending implementation. *Braham*, 794 F. Supp. 3d at 837. And granting Plaintiffs or class members eligibility waivers, to the extent that they would qualify for them, is consistent with the NCAA's own proffered *procompetitive* rationale, insofar as expanding the number athletes in the relevant market—rather than artificially and arbitrarily limiting it—would expand output. *See* ECF No. 32 at 17. *See also Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 673 (7th Cir. 1992) ("Rivalry makes for a more attractive product, which then attracts a larger audience—the very expansion of output that the antitrust laws foster."); *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1253 (7th Cir. 1995) ("Output often grows in the process as competition intensifies."); *Town of Concord, Mass. v. Bos. Edison Co.*, 915 F.2d 17, 21–22 (1st Cir. 1990) ("[A practice] harms that [competitive process] when it *obstructs* the achievement of competition's basic goals." (citation modified)). Thus, "Plaintiff's proposed alternative eliminates the anticompetitive harms discussed above while appearing to satisfy" the *procompetitive* rationale "advanced by the NCAA." *Pavia*, 760 F. Supp. 3d at 543.

\* \* \*

The "whole point of the rule of reason" is to examine "the circumstances, details, and logic of a restraint" to make sure that it "unduly harms" competition before any court "declares it unlawful." *Alston*, 594 U.S. at 97. *See also id.* (noting that the factfinder "weighs all of the circumstances of a case in deciding whether a restrictive practice should

44

be prohibited as imposing an unreasonable restraint on competition" (citation modified)).
*Alston* further counsels, as the NCAA observes, that courts should afford a "wide berth to business judgments" before finding antitrust liability. *Id.*

The Court takes this second point seriously. It is "neither [an] economic nor industry" expert. *Id.* However, the Court must also "discern and apply the law" as it "finds it." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 770 (2023).

Application of well-settled antitrust principles, *see id.*, lead the Court to the finding and conclusion that Plaintiffs have met their *likelihood of success on the merits* burden as to their claim under Section 1 of the Sherman Act. Plaintiffs have identified a market. The logic behind the NCAA's commercial restraint on that market, *see Alston*, 594 U.S. at 97, does not withstand antitrust scrutiny. In the sense that the NCAA offers no *procompetitive rationale* for it, and that even if the NCAA had done so Plaintiffs have shown there are *substantially less restrictive means* for realizing any purported rationale. And weighing the "harms and benefits," of the Rule, *L.*, 134 F.3d at 1019, Plaintiffs have shown that there are serious competitive harms to both themselves and *the market* without any material benefits that, on balance, offset these market-wide competitive harms.

Accordingly, the Court proceeds in its preliminary injunction analysis.

### 2. Irreparable Harm

The parties dispute whether Plaintiffs will suffer irreparable harm absent injunctive relief. *Compare* ECF No. 19-1 at 22, *with* ECF No. 32 at 20. The Court need not dwell. "Courts have repeatedly found that college students suffer irreparable harm when they

are denied the opportunity to play sports." *Ohio*, 706 F. Supp. 3d at 597 (citation modified). The Court finds the reasoning of these cases persuasive. *See, e.g., Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009) ("[G]iven the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis." (citation modified)). Notably, the Tenth Circuit has made a comparable observation in a different doctrinal context. *See Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 833 (10th Cir. 1993) ("[I]nsofar as defendant's continuing violation of Title IX operates to deprive plaintiffs of the opportunity to play softball, we believe monetary relief alone is inadequate. The district court correctly ordered an equitable remedy.").

At bottom, the Court agrees with Plaintiffs that they face the "loss of a season" and exclusion from sports teams for which they might otherwise be eligible. ECF No. 19-1 at 22. This harm is certainly impending, which is to say both "likely" and non-theoretical, *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018), and the inability to play in the upcoming season cannot be "compensated after the fact by money damages," *id.* (citation modified)). *See also D.B.U.*, 779 F. Supp. 3d 1264, 1283 (D. Colo. 2025) (finding that petitioners met *irreparable harm* burden where the harms they "face[d]" were not "so remote—or [were] simply monetary"). To the extent that Plaintiffs face a loss of NIL compensation as well, *see* ECF No. 19-1 at 23, this *concurrent* harm does not displace the fundamental and irreparable harm they face if they are excluded from playing in the upcoming season. *See, e.g., Denver Rockets v. All-Pro Mgmt., Inc.*, 325 F. Supp. 1049, 1057 (C.D. Cal. 1971) (finding that "[i]f [movant] [was]  unable to continue to play

46

professional basketball . . . he w[ould] suffer irreparable injury in that a substantial part of his playing career will have been dissipated").[29] For the same reason, the NCAA errs in arguing that to the extent injunctive relief could attend certain Plaintiffs' continued education, *see* ECF No. 32 at 21, this does not obviate the harm they face from being excluded as Division I athletes in the upcoming season. *See, e.g., Braham*, 794 F. Supp. 3d at 837 ("The Court finds that the denial of the opportunity to play sports is irreparable harm." (citation modified)).

Accordingly, Plaintiffs have met their *irreparable harm* burden.

### 3. Balance of Equities

Plaintiffs argue that the "balance of equities tips sharply in favor" of granting their request for relief because, absent injunctive relief, they will "permanently lose their final season of collegiate athletic competition." ECF No. 19-1 at 23. Moreover, an injunction that preserves this ability imposes a "minimal burden" on the NCAA, given that granting Plaintiffs injunctive relief would "mean [only] that, for one season and for a defined class of athletes, the same eligibility framework applies to [Plaintiffs] as their teammates." *Id.* The NCAA argues that granting Plaintiffs' request for relief would be inequitable because then "thousands of student-athletes . . . will [then] be faced with reduced opportunity . . .

---

[29] The NCAA casts any NIL loss as "speculative economic harm" that does not demonstrate *irreparable harm.* ECF No. 32 at 21. Plaintiffs have satisfied their *irreparable harm* burden on a separate basis. However, at least one court has observed that lost NIL opportunities are not purely economic, bolstering Plaintiffs' argument that they stand to lose "long-term career advancement opportunities" in addition to the ability to play this coming season. ECF No. 35 at 13. *See also Braham*, 794 F. Supp. 3d at 838 ("Regardless of whether such offers may result in calculable monetary compensation, the foregone opportunity to 'market' one's 'name' and 'likeness' and to 'showcase abilities to future employers' cannot be estimated or quantified." (citation modified)).

47

to allow individuals like Plaintiffs an additional season of competition." ECF No. 32 at 22. The Court agrees with Plaintiffs that equitable considerations resolve in their favor.

*First*, Plaintiffs correctly observe that the NCAA provides no evidentiary support for its contention that the purportedly wide-ranging effect of any injunctive relief—affecting "thousands of student-athletes," *id.*—will cause harm it. *See* ECF No. 35 at 14. This evidentiary shortcoming is sufficient to tip the balance of equities in Plaintiffs' favor, who have put forth evidence regarding the irreparable harm they will suffer absent injunctive relief. *See, e.g., Am. Carriers, Inc. v. Baytree Invs., Inc.*, 685 F. Supp. 800, 811 (D. Kan. 1988) ("Because defendants have failed to produce any evidence of harm, the balance of harms tips toward plaintiff."); ECF No. 19-4 at ¶ 10; ECF No. 19-5 at ¶ 7–8; ; ECF No. 19-6 at ¶ 9.[30]

*Second*, the Court is persuaded, upon review of the parties' arguments and the preliminary injunction record, that the harms the NCAA faces are much less severe. Fundamentally, Plaintiffs face *irreparable* harm, and the NCAA *itself* faces challenges in administering Plaintiffs' relief and ensuring their eligibility for the upcoming season. There is no contest between the two, and they resolve in Plaintiffs' favor. *See, e.g., Tennessee*, 718 F. Supp. 3d at 766 ("Here, the balance of the equities weighs heavily in favor of Plaintiffs because neither the NCAA nor any other affected individual or entity will face

---

[30] This same evidence bolsters Plaintiffs' argument that Plaintiffs have competed alongside other athletes who enjoyed at least five years of eligibility. See id. at ¶ 10 ("I simply don't understand the equity in allowing the Class of 2022 to compete against older and stronger athletes in their fifth, sixth, and even seven years of eligibility throughout college and not giving us one last year."). The Court tends to agree with Plaintiffs that the NCAA's concern as to how granting Plaintiffs relief may crowd out opportunities for incoming student-athletes seems at odds with evidence that indicates Plaintiffs themselves competed alongside other student-athletes whose length of competition and eligibility posed precisely the same purported risks.

substantial harm with the issuance of an injunction, whereas, as explained above, student-athletes face irreparable harm."); *Ohio*, 706 F. Supp. 3d at 600 ("This Court does not see substantial harm to the NCAA that would result from this Court granting a temporary injunction. A prohibition on enforcing the Transfer Eligibility Rule causes no harm to the NCAA or any other entity or individual."); *Braham*, 794 F. Supp. 3d at 839; *Pavia*, 760 F. Supp. 3d at 544.

### 4. Public Interest

Finally, the parties dispute whether issuance of a preliminary injunction would be in the public interest. *Compare* ECF No. 19-1 at 24, *with* ECF No. 32 at 21. The NCAA's argument regarding this factor is limited to a header in its brief. *See id.* Presuming this deficiency is not a waiver, *cf. Voda v. Medtronic Inc.*, 899 F. Supp. 2d 1188, 1200 n.20 (W.D. Okla. 2012), *aff'd*, 541 F. App'x 1003 (Fed. Cir. 2013), Plaintiffs have met their burden of showing the public interest favors injunctive relief. As they observe, ensuring the NCAA's compliance with federal antitrust law will serve the public interest, thus satisfying this factor. *See, e.g., Tennessee*, 718 F. Supp. 3d at 766 ("Finally, the requested injunctive relief will serve the public interest because it will prevent anticompetitive behavior." (citation modified)); *Ohio*, 706 F. Supp. 3d at 600 ("Free and fair competition in labor markets is essential to the American economy."); *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1205 (10th Cir. 2006) ("The purpose of the antitrust laws is to protect the public." (citation modified)); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 266 (1946) ("The dominant purpose of the Anti-Trust Acts is protection of

the public interest by prohibiting unjustifiable restrictions upon competitive enterprise.")
(Frankfurter, J., dissenting).

* * *

The NCAA is correct: A preliminary injunction is an "extraordinary remedy"—"the exception rather than the rule." *U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989) (citation modified); ECF No. 32 at 8. But where movants meet their four-factor burden, issuance of an injunction is proper. *See Denver Homeless*, 32 F.4th at 1277 ("An injunction can issue only if each factor is established." (citation modified)).

Plaintiffs have met their burden at every step. They are likely to succeed on the merits of their Section 1 claim. They will suffer irreparable harm without issuance of an injunction. And the balance of equities, as well as the public interest, favor them. They are entitled to the injunctive relief they seek.

## IV.     CONCLUSION

Consistent with the above analysis, the Court GRANTS Plaintiffs' Motion for Temporary Restraining Order, ECF No. 19.

DATED this 31st day of July 2026.

BY THE COURT:

_____

Charlotte N. Sweeney
United States District Judge

50