**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-03063-CNS-KAS

Brock Wisne,
Aidan Shaw,
Aislin Malcolm,
Cade Tyson,
Abigail Jefferies,
Anthony Johnson,
Louie Jordan,
Jefferson De La Cruz Monegro,
Isaiah Jones,
Dimond Loosli,
Brett Griffiths, and
Jake Morell on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

National Collegiate Athletic Association,

Defendant.

---

**DEFENDANT NATIONAL COLLEGIATE ATHLETIC ASSOCIATION'S EMERGENCY MOTION FOR ADMINISTRATIVE STAY AND MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL**

---

Defendant National Collegiate Athletic Association ("NCAA") respectfully moves this Court to stay its Orders granting and clarifying preliminary injunction (ECF 38 & 41), pending the NCAA's appeal to the U.S. Court of Appeals at the Tenth Circuit, and for an administrative stay of the preliminary injunction pending disposition of this motion, extending to at least 48 hours after the Court's ruling.

## INTRODUCTION[1]

A stay is necessary to prevent irreparable harm to the NCAA, hundreds of NCAA member institutions, thousands of their student-athletes, and the orderly administration of collegiate athletics nationwide.

The NCAA is substantially likely to succeed on the merits. Plaintiffs indisputably exhausted their eligibility at the end of the 2025-26 season. The Court has now determined that the NCAA must alter the Age-Based Eligibility Rule so that it applies to them. But Plaintiffs did not provide sufficient proof of any of the elements of an antitrust case—merely providing some evidence, in an expert declaration, does not satisfy the well-established requirement of *economic* evidence based on current market realities.

Absent a stay, the NCAA and its member institutions will suffer substantial and irreparable harm through the upending of settled rosters, the disruption of established reliance interests of thousands of student-athletes, and the destabilization of the 2026–27 athletic season–all things that began to occur within hours of the Court's decision. By contrast, Plaintiffs face minimal harm from a stay because they have already received the full measure of eligibility under the rules in effect throughout their collegiate careers.

---

[1] Pursuant to D.C.COLO.LCivR 7.1(a), counsel for the NCAA conferred with counsel for Plaintiffs. Plaintiffs oppose the relief requested.

Finally, the public interest strongly favors a stay, as it preserves the NCAA's ability to govern collegiate athletics based on the collective expertise of the leaders of the Nation's institutions of higher education, rather than a small group of attorneys, and protects the legitimate expectations of most student-athletes, who have already enrolled and made transfer decisions in reliance on settled rules.

This motion is brought on an emergency basis because the Court's order dramatically reshapes the pool of eligible players in the 2026-27 Academic Year and is already having immediate effects on schools and countless student-athletes. To the extent the Court finds further briefing necessary, the NCAA respectfully requests that the Court enter a briefing schedule requiring Plaintiffs to respond to this Motion by 5:00pm on Monday, August 3, the NCAA to reply by Tuesday, August 4 by 10:00 am, and that the Court render a decision by Wednesday, August 5. The NCAA respectfully submits, however, that the Court may resolve the motion its own accord even earlier. L.R. 7.1(d).

## **LEGAL STANDARD**

Courts weigh four factors in evaluating a stay pending appeal: (1) whether the movant has made a strong showing that it is likely to succeed on the merits, (2) the threat of irreparable harm absent a stay, (3) whether opposing parties will be substantially injured if the stay is granted, and (4) the public interest. *See Coomer v. Make Your Life Epic LLC*, Civil Action No. 21-cv-3440, 2024 U.S. Dist. LEXIS 183974, at *12–13 (D. Colo. Oct. 8, 2024) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The Court has the inherent power to temporarily stay a preliminary injunction pending a decision on a motion seeking a stay pending appeal. *Carbajal v. Colorado Dep't of Corr.*, No. 22-CV-03062-

PAB-KAS, 2025 WL 746918, at *1 (D. Colo. Feb. 25, 2025) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)).

## ARGUMENT

### I. The NCAA Is Substantially Likely To Succeed on Appeal

The NCAA is substantially likely to succeed on the merits in its appeal because Plaintiffs cannot establish an antitrust claim.

#### A. Plaintiffs Conceded That the Challenged Restraint Is *Lawful*

Plaintiffs' antitrust claim should have failed at the threshold as they did not challenge the NCAA's age-based eligibility model, ECF 1, Compl. ¶ 10, or the previous "Five-Year Rule," under which they exhausted their eligibility. Instead, Plaintiffs challenged only the *timing* of the new rule's implementation. This theory finds no support in antitrust doctrine and is foreclosed by binding precedent.

In *Christy Sports, LLC v. Deer Valley Resort Co.*, the Tenth Circuit rejected an antitrust challenge to the timing of enforcement of an otherwise lawful restrictive covenant. 555 F.3d 1188, 1198 (10th Cir. 2009). The defendant ski resort had sold parcels of land subject to restrictive covenants preventing use for ski-rental purposes without the resort's written consent. *Id.* at 1190–91. For approximately fifteen years, the resort did not enforce these covenants and permitted competitors to enter the ski-rental market. *Id.* at 1191. When the resort later reversed course and began enforcing the covenants, Christy Sports—one of the competitors—sought an injunction under the Sherman Act, conceding the restrictive covenant was lawful but challenging the timing of enforcement. *Id.* at 1196.

The Tenth Circuit explained that the defendant "should not be forever locked into

a business decision made in 1990, especially when it took an affirmative step to preserve its future flexibility by bargaining for a restrictive covenant." *Id.* at 1198. That the defendant "had the right to [enforce its restrictive covenant] from the beginning, and the fact that it chose to do otherwise for some time does not eliminate that right." *Id.* Antitrust laws do not "stifle a business's ability to experiment in how it operates, nor forbid it to change course upon discovering a preferable path." *Id.*

*Christy Sports* applies with equal force here. The NCAA Manual makes clear that the NCAA membership can amend its rules. The NCAA membership recently decided that shifting to an age-based eligibility model going forward would better serve its objectives. Just as in *Christy Sports*, the antitrust laws do not prevent the NCAA from "chang[ing] course upon discovering a preferable path." *Id.*

This Court distinguished *Christy Sports* as a case about "whether 'the creator of a resort has [an] obligation under the antitrust laws to allow competitive suppliers of ancillary services on its property.'" (ECF 38, Order Granting Preliminary Injunction ("Order") at 42 n.27 (quoting *id.* at 1193)). But the rule of law from *Christy Sports* was broader. Just as the Plaintiffs here did not dispute the substance of the NCAA's age-based eligibility model, Christy Sports "d[id] not seriously argue that it was impermissible" for the defendant to impose its restrictive covenant. *Christy Sports*, 555 F.3d at 1196. And as here, *Christy Sports* concerned a challenge to the *timing* of a defendant's exercise of an undisputed right. *Id.* at 1198. The same logic applies here. Plaintiffs here entered the 2025–26 season knowing it would be their last. The NCAA's membership has accordingly taken nothing away from Plaintiffs. Because Plaintiffs failed to establish the existence of

a restraint of trade, the NCAA is substantially likely to prevail.

**B. Each Step Under the Rule of Reason Supports the NCAA**

Even if Plaintiffs' implementation-timing antitrust theory *were* cognizable, they could not satisfy the rule of reason. It was Plaintiffs' burden to demonstrate a substantial anticompetitive effect in a properly defined relevant market. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). Recent circuit-court decisions have unanimously required plaintiffs challenging NCAA eligibility rules to present economic evidence reflecting a careful analysis of market realities. Plaintiffs have failed to do so. The NCAA also "show[ed] a procompetitive rationale," and Plaintiffs failed to meet their subsequent burden to demonstrate that the NCAA's "procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542.

**1. Plaintiffs Did Not Define a Relevant Market**

Before a court can assess whether a rule has an anticompetitive effect, it "must first define the relevant market." *Id.* at 542. "[T]he relevant market is defined as the area of effective competition" which is the "arena within which significant substitution in consumption or production occurs." *Id.* at 543 (internal quotes omitted).

The Third, Fourth, Seventh, and Ninth Circuits have all reversed or vacated preliminary injunctions against NCAA eligibility rules where plaintiffs failed to present economic evidence accounting for the "widescale market change in college athletics relating to athlete compensation" in the wake of *NCAA v. Alston*. *See Elad v. NCAA*, 160 F.4th 407, 411 (3d Cir. 2025); *Fourqurean v. NCAA*, 143 F.4th 859, 870 (7th Cir. 2025); *Robinson v. NCAA*, 172 F.4th 271, 294 (4th Cir. 2026); *Blythe v. NCAA*, No. 26-01106,

ECF. No. 26 (9th Cir. Apr. 8, 2026) (vacating without opinion injunction that was virtually identical to those rejected in *Elad*, *Fourqurean*, and *Robinson*).

Plaintiffs here did not clear this bar. They asserted that the relevant market is "the labor market for Division I college athletes," in which Plaintiffs allege the NCAA has monopsony power. (ECF 19-1, Pls.' Mem. at 17, 20). That market is one that no court has ever accepted in the long history of NCAA antitrust litigation, because it rests on the supposition that different sports offerings at different schools are substitutes for each other—e.g. basketball for baseball.

The declaration of Dr. Berri (ECF 19-3)—the only evidence offered by Plaintiffs—is insufficient to sustain that implausible definition. In rendering his statement, Dr. Berri replicated the flaw identified by the Third, Fourth, and Seventh Circuits by basing conclusions on stale data that do not reflect current market realities. For example, in his comparison between the NBA and NCAA DI men's basketball, Dr. Berri compared the rate of underclassmen drafted into the NBA in the four years preceding *Alston* (2016–2020) (76%) and the four years thereafter (2021–2025) (73%). (Berri Decl. ¶ 50.) But Dr. Berri did not consider data from the 2025–26 academic year, which was the first year each DI school could pay up to $20.5 million in revenue sharing to student-athletes under the settlement reached in *In re College Athlete NIL Litigation*, No. 4:20-cv-03919-CW, ECF 958-1, Fourth Am. Stipulation and Settlement Agreement (N.D. Cal. May 7, 2025) (the "*House* Settlement"). Nothing stopped Plaintiffs from attempting to get this data—or the Court from insisting on evaluating it prior to ruling.

The available evidence shows that current market realities undercut Dr. Berri's

conclusions, which is precisely why more economic evidence was required to establish a relevant market. As the NCAA showed, in the 2025–26 academic year, underclassmen entered the NBA at a dramatically reduced rate. (*See* ECF 32-3, Decl. of Dr. Matthew Backus ("Backus Decl.") ¶¶ 56, 58.) This massive shift suggests that student-athletes increasingly view college basketball as a substitute for professional basketball.

Plaintiffs' failure to present evidence of current market realities in support of their chosen market definition is dispositive. Dr. Berri set forth an incoherent and unprecedented market for all of Division I sports and ignored evidence from the most recent 2025–26 season, which was transformative in college sports. Dr. Berri's analysis is squarely in line with the expert opinions rejected in *Elad* and *Robinson*.

**2. Plaintiffs Did Not Show Anticompetitive Effects**

Plaintiffs also presented no evidence of anticompetitive effects—the other requirement at the first step of the rule of reason. Plaintiffs appear to have posited that their mere exclusion from the alleged market demonstrates harm to competition. That is incorrect as a matter of law. *See Fourqurean*, 143 F.4th at 870. Plaintiffs had to demonstrate that their exclusion from college sports in 2026–27 harms output, price, or quality in the market. See *Am. Express*, 585 U.S. at 542.

There is no plausible harm to *output*. The total number of roster spots in college sports is fixed. (Backus Decl. ¶ 78.) The Court concluded that there are many open roster spots now, but without any evidence of current market conditions or of the composition of single college team's roster. Nor does the challenged implementation of the age-based eligibility model decrease *price* in the alleged market. Under the *House* Settlement, all

schools are subject to a revenue-sharing cap. If anything, basic economics suggest that limiting the number of participants in the labor market should *increase* total compensation by increasing competition between schools for a limited talent pool. (*Id.* ¶¶ 87–95); *Fourqurean*, 143 F.4th at 871 ("Under ordinary principles of supply and demand, a restraint that limits the supply of workers in a labor market would increase, not decrease, worker compensation. The Five-Year Rule may operate differently, but the record contains no evidence that would allow us to draw that conclusion.").

To the extent Plaintiffs attempt to rely upon the potential for increased earnings in the third-party NIL market, such effects cannot support an antitrust claim against the NCAA. Plaintiffs' alleged harm relies on secondary or indirect anticompetitive effects: they allege that the NCAA's rules, by rendering student-athletes ineligible, indirectly impact third-party NIL compensation by shaping third parties' demand for student-athletes' NIL. The Sixth Circuit has rejected this precise theory—of proving an anticompetitive effect through the indirect effects of the challenged restraint—in *NHL Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462 (6th Cir. 2005) ("*NHLPA II*"). There, the court explained that "we have been unable to uncover any cases addressing the issue of whether a defendant is subject to antitrust liability for secondary anti-competitive effects of the defendant's actions." 419 F.3d at 474. It therefore "decline[d], in this case, to establish definitive rules regarding whether or when an anti-competitive injury that is only secondarily or indirectly caused by a defendant's alleged restraint on trade may ever support a viable claim under the Sherman Act." *Id.* at 475. It then affirmed dismissal of the plaintiffs' complaint for failure to state a claim upon which relief could be granted. *Id.*

at 476; *cf. Tal v. Hogan*, 453 F.3d 1244, 1258 (10th Cir. 2006) (holding that antitrust standing "excludes secondary or remote injuries"); *Comet Mech. Contractors, Inc. v. E. A. Cowen Constr., Inc.*, 609 F.2d 404, 407 (10th Cir. 1980) (affirming summary judgment for lack of antitrust standing where the plaintiff's "injury is purely an incidental result of anticompetitive activity in another segment of the economy"). Plaintiffs offered no reason for departing from this line of authority.

At most, Plaintiffs suggested that competition *on the field* would be harmed by removing experienced student-athletes, (Pls.' Mem. at 19), but they did not substantiate that claim in any way. More importantly, harm to athletic competition is irrelevant to quality that is protected under antitrust law. *See NHL Players Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 720 (6th Cir. 2003) ("[T]he effect on the market as defined by [Plaintiffs] is on athletic competition, which is not protected by the antitrust laws."). Accordingly, the NCAA is likely to prevail on the merits.

**3. Prospective Implementation of Age-Based Eligibility Is Procompetitive**

Plaintiffs did not dispute that there are recognized benefits to the NCAA's eligibility rules. For example, the NCAA's rules preserve high-school students' ability to, one day, participate in DI sports. For a class of graduating high-school-senior student-athletes to have the opportunity to ***enter*** DI rosters, there must be a corresponding ***exiting*** class of graduates to open up opportunities. The NCAA's rules governing who is eligible to compete are also procompetitive because they expand output by creating and preserving the unique offerings of DI athletics, and they serve to align student-athletes' eligibility for competition with roughly the time it takes to pursue an undergraduate degree.

The Court considered it a "flawed premise" that the exclusion of "athletes from the

labor market is actually procompetitive." (ECF 38 at 38.) But that is the *basis* for the unique product offered by NCAA athletics—that individuals compete in college sports when they are pursuing college degrees and move on after a defined period of time. Not even Plaintiffs dispute that it is procompetitive for the NCAA to be able to implement and enforce eligibility rules. Indeed, the Court adopted Dr. Berri's analysis that "'College sports are different. College sports is a competition between students attending college. The class *is* college students.'" (*Id.* at 25 (quoting ECF 19-3 at ¶¶ 41–42).) Without the ability to set rules about who is eligible—and without athletes moving on once their eligibility has expired—college sports would not exist.

To the extent the NCAA would have needed to offer procompetitive justifications for the *implementation* of the age-based eligibility model, it did so as well. The decision to limit the new age-based framework to currently eligible student-athletes and not revive the expired eligibility of former student-athletes protects competitive opportunities and reliance interests of thousands of student-athletes entering the 2026–27 season. Opportunities to participate in college sports are zero sum. Roster spots are fixed. If Plaintiffs are permitted to join a roster, they will take a spot from someone else who *is* eligible—*including those who expect to use the first of their five years under the Age-Based Eligibility Rule*. Each contest has a fixed number of minutes per game and fixed opportunities to see the field or court at a given position. If Plaintiffs compete too, it will crowd out other student-athletes looking for their first opportunity, or opportunities to develop as their collegiate careers progress. (*See* Backus Decl. ¶¶ 107–108.) There is already evidence of this happening, and the Court's decision to allow hundreds if not

thousands of graduated student-athletes to return to college sports will exacerbate the problem. Alyce Brown, *The NCAA's 5-for-5 Rule Is Costing Some Athletes Their Scholarship Offers. Here's Why*, *Yahoo: Sports* (July 30, 2026), https://sports.yahoo.com/articles/ncaas-5-5-rule-costing-160055653.html.

#### 4. Plaintiffs Have Not Provided Less Anticompetitive Means To Achieve the NCAA's Procompetitive Efficiencies

Plaintiffs also could not satisfy their burden to establish substantially less restrictive means. The NCAA membership was faced with a choice: apply the new rules retroactively and take away opportunities from entering high-school students or apply them prospectively so incoming student-athletes can have meaningful opportunities to compete. (Id. ¶¶ 110–111.) These two outcomes cannot both be achieved. The NCAA's membership made its choice. Plaintiffs have asked this Court to make a different policy judgment about what the NCAA should do. But "judges make for poor central planners and should never aspire to the role." *NCAA v. Alston*, 594 U.S. 69, 103 (2021) (cleaned up). Thus, "[w]hen it comes to fashioning an antitrust remedy, we acknowledge that caution is key. Judges must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives." *Id.* at 106.

## II. The NCAA Will Suffer Irreparable Harm Absent a Stay

Absent a stay, the NCAA, its member institutions, and thousands of their student-athletes will suffer immediate and irreparable harm. The opportunities to participate in college sports are zero sum: roster spots are fixed, and each contest has a fixed number of minutes and opportunities to compete. If Plaintiffs and class members are permitted to join rosters, they will displace eligible student-athletes who made life-altering decisions

about where to attend college and compete, in reliance on settled eligibility rules and the reasonable understanding that ineligible individuals like Plaintiffs would remain that way. This includes those coming into their first of five seasons under the Age-Based Eligibility Rule but are at the last minute being replaced by those coming back for a fifth year.

Whether or not all DI rosters are presently "at maximum capacity" does not affect the injunction's significant, irreparable harm. (ECF 38 at 35.) There is no evidence in the record that schools have many open roster spots in the *current* season. Even under Plaintiffs' own calculation, the number of available DI roster spots is only 4,808 in women's sports and 988 in men's. (*See* ECF 35-1 ¶ 3.) Considering Plaintiffs' calculation of "more than 200,000 athletes" competing in DI, the class likely contains tens of thousands of members—far more than available roster spots. (*See* ECF 20-1 at 2 n.4.) Absent a stay, this excess will inevitably displace eligible student-athletes.

Applying the age-based eligibility model retroactively would destabilize rosters for the 2026–27 season and jeopardize the settled reliance interests of hundreds of thousands of student-athletes counting on 2026–27 roster spots but who were not given a voice in this proceeding, or any opportunity to be heard. Indeed, the injunction does not impose only a "minimal burden" on the NCAA. (ECF 38 at 47.) When making or amending its rules, the NCAA carefully considers the consequences to its member schools and student-athletes, basing its ultimate decisions on these calculations. The injunction drastically alters that status quo. When the NCAA's policy and business judgments are thrown in flux by courts that have yet to fully adjudicate the issues, the NCAA cannot make its decisions effectively. Absent a stay, the NCAA would be irreparably harmed by

losing its ability to self-govern in the best interests of student-athletes and college sports.

## III. Plaintiffs Will Not Be Harmed by a Stay

While the NCAA and thousands of other student-athletes face irreparable harm absent a stay, Plaintiffs face minimal harm from a stay as they have already received the full measure of eligibility applicable to them under each version of the NCAA Manual in effect during their collegiate careers. When they entered college, they knew they had five years to compete in up to four seasons of competition. To the extent Plaintiffs claim they need eligibility to continue their education, their claims are not supported by evidence. The NCAA's core guarantees ensure that student-athletes who have not yet finished their undergraduate degrees may maintain their scholarships, and all member institutions are free to provide scholarships for graduate school. (*See* ECF No. 32 at 4 & n.2, 20.)

The Order also states that Plaintiffs "face the loss of a season" (*Id.* at 46.) But granting a stay *would not* prevent Plaintiffs from having a fifth season of competition. Plaintiffs identified nothing critical to participation in the 2026–27 season, and could continue participation in a later year. If a stay is granted and Plaintiffs prevail on appeal, they can participate in collegiate athletics during the season subsequent to any decision granting them an extra year of eligibility.

## IV. The Public Interest Favors a Stay

The public interest strongly favors granting a stay. The Order stated that the NCAA's public-interest analysis "[wa]s limited to a header in its brief." (*Id.* at 48.) But that is not so; the NCAA argued the public interest factor alongside the balance of the equities. Those clearly both cut in the NCAA's favor. The injunction was granted on a class-wide

basis, to a class of undefined size but that might number in the many thousands. Allowing those students to return to college after graduation day on most if not all college campuses, and after initial enrollment by new student-athletes on those campuses, dramatically alters the opportunities available to over 180,000 DI student-athletes who have operated in reliance on the NCAA's rules being applied as written.

The NCAA's analysis of the equities mirrors the public interest. (*See* ECF 32 at 20–21.) The injunction hamstrings the NCAA's ability to govern collegiate athletics in an orderly fashion. Denying the stay would create uncertainty and instability throughout DI athletics, harm the legitimate expectations of the overwhelming majority of student-athletes who enrolled and transferred in reliance on settled rules, and undermine the NCAA's considered judgment about how best to implement a major policy change.

The public interest also favors the orderly administration of justice. The equities counsel against decisions concerning NCAA eligibility rules, with such sweeping implications, issued on an expedited basis and a truncated record. *See, e.g.*, *Zeigler v. NCAA*, No. 3:25-cv-226, 2025 WL 1671952, at *5 (E.D. Tenn. June 12, 2025) ("[G]iven the fixed number of roster spots available for each Division I basketball team, an injunction would run the risk of harming (1) currently-enrolled Division I basketball players who have already committed to a member institution and (2) current high school seniors who might have their college recruitment disrupted . . ."); *Coley v. NCAA*, 792 F. Supp. 3d 634, 649 (E.D.N.C. 2025) ("Granting Coley's request would upend the NCAA's Division I Bylaws and affect 'over 180,000' Division I student-athletes in 'multiple sports.' Even if the court granted Coley the relief he requests, nothing guarantees that Coley will get the additional

playing time and NIL money he seeks. As Coley knows from his own experience, personal circumstances, unforeseen injuries, and team needs affect playing time.") (internal citation omitted). A stay will preserve the status quo and allow the merits of Plaintiffs' claims to be adjudicated with fair and thorough process, involving the development and presentation of evidence, before the NCAA is required to implement an unwarranted and disruptive change to its eligibility system.

Finally, the public interest favors promoting competition and consumer choice in collegiate athletics. Although the Court found that the public interest favored an injunction on the basis that the NCAA's implementation of its age-based eligibility model is anticompetitive, (ECF 38 at 49,) as discussed *supra*, the NCAA is substantially likely to succeed in demonstrating that it has complied with federal antitrust law. Allowing the injunction to remain in effect would force the NCAA to hurriedly implement a rule retroactively in a manner the membership determined would be harmful to competition and contrary to the interests of the majority of student-athletes. The public has a strong interest in ensuring that the NCAA can exercise its business judgment about how to structure collegiate athletics and protect the reliance interests of student-athletes, free from judicial micromanagement. *See, e.g.*, *Alston*, 594 at 102 ("[A]ntitrust courts must give wide berth to business judgments before finding liability.").

The NCAA respectfully requests that the Court GRANT its motion to (1) provide an administrative stay of the preliminary injunction pending disposition of this motion and for 48 hours following the same; and, (2) stay the preliminary injunction pending appeal.

Respectfully submitted this 2nd day of August, 2026.

DORSEY & WHITNEY LLP

*<u>/s/ Ben D. Kappelman</u>*
Andrea Ahn Wechter
wechter.andrea@dorsey.com
Ben D. Kappelman
kappelman.ben@dorsey.com
DORSEY & WHITNEY LLP
1400 Wewatta Street, Suite 400
Denver, CO 80202-5549

Rakesh N. Kilaru
Wilkinson Stekloff LLP
10th Floor
Washington, DC 20036
Telephone: 202-847-4046
Fax: 202-847-4005
rkilaru@wilkinsonstekloff.com

David J. Zeitlin
Holland & Knight LLP
150 Third Ave. S., Suite 2800
Naville, Tennessee 37208
Telephone: 615-244-6380
Fax: 615-244-6804
david.zeitlin@hklaw.com

**ATTORNEYS FOR DEFENDANT NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**

# CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2026, I caused the foregoing document, **EMERGENCY MOTION FOR ADMINISTRATIVE STAY AND MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL**, to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Ben D. Kappelman*
DORSEY & WHITNEY LLP