**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-03063-CNS-KAS

BROCK WISNE,
AIDAN SHAW,
AISLIN MALCOLM,
CADE TYSON,
ABIGAIL JEFFERIES,
ANTHONY JOHNSON,
LOUIE JORDAN,
JEFFERSON DE LA CRUZ MONEGRO,
ISAIAH JONES,
DIMOND LOOSLI,
BRETT GRIFFITHS, and
JAKE MORELL on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

*Defendant.*

---

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S EMERGENCY MOTION FOR ADMINISTRATIVE STAY AND MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL**

---

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 1

III. LEGAL STANDARD ..... 2

IV. ARGUMENT ..... 3

- A. The NCAA Does Not Show It Is Likely to Succeed on Appeal ..... 3
  - 1. This Court's Analysis of Christy Sports Should Not Change ..... 4
  - 2. Clear Error Review Forbids Reweighing Competing Declarations ..... 5
  - 3. Defendant's Indirect-Effects Theory is Unadopted and Inapplicable ..... 9
- B. The NCAA Identifies No Irreparable Injury of Its Own. ..... 11
- C. A Stay Would Inflict on the Class the Very Injury This Court Has Already Found Irreparable. ..... 13
- D. The Public Interest Favors Antitrust Enforcement and Stability ..... 13
- E. An Administrative Stay Would Inflict the Harm the Injunction Prevents ..... 15

V. CONCLUSION ..... 15

## TABLE OF AUTHORITIES

### CASES

*Biediger v. Quinnipiac Univ.*,
616 F. Supp. 2d 277 (D. Conn. 2009) .......... 13

*Black v. Occidental Petroleum Corp.*,
69 F.4th 1161 (10th Cir. 2023) .......... 7, 8

*Blythe v. NCAA*,
No. 26-01106 (9th Cir. Apr. 8, 2026) .......... 5

*Braham v. NCAA*,
794 F. Supp. 3d 824 (D. Nev. 2025) .......... 14

*Christy Sports, LLC v. Deer Valley Resort Co.*,
555 F.3d 1188 (10th Cir. 2009) .......... 3, 4, 5

*Citizens United v. Gessler*,
773 F.3d 200 (10th Cir. 2014) .......... 3

*Coley v. NCAA*,
792 F. Supp. 3d 634 (E.D.N.C. 2025) .......... 14

*Comet Mech. Contractors, Inc. v. E. A. Cowen Const., Inc.*,
609 F.2d 404 (10th Cir. 1980) .......... 10

*Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist.*,
No. 1:24-cv-03512-CNS-STV, 2025 WL 1000774 (D. Colo. Apr. 3, 2025) .......... 3, 12

*F.T.C. v. Butterworth Health Corp.*,
946 F.Supp. 1285 (W.D. Mich. 1996) .......... 8

*Fourqurean v. NCAA*,
143 F.4th 859 (7th Cir. 2025) .......... 9

*Martinson v. NCAA*,
804 F. Supp. 3d 1109 (D. Nev. 2025) .......... 7

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*,
419 F.3d 462 (6th Cir. 2005) .......... 10, 11

*Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*,
325 F.3d 712 (6th Cir. 2003) .......... 10, 11

*NCAA v. Alston*,
594 U.S. 69 (2021) .......... 6, 9, 15

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 3

*Obeslo v. Great-W. Life & Annuity Ins. Co.*,
6 F.4th 1135 (10th Cir. 2021) .......... 6

*Ohio v. NCAA*,
706 F. Supp. 3d 583 (N.D. W. Va. 2023) .......... 8, 14

*Reazin v. Blue Cross & Blue Shield of Kan., Inc.*,
899 F.2d 951 (10th Cir. 1990) .......... 5

*Roberts v. Colo. State Bd. of Agric.*,
998 F.2d 824 (10th Cir. 1993) .......... 13

*Tal v. Hogan*,
453 F.3d 1244 (10th Cir. 2006) .......... 10

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*,
305 F.3d 1124 (10th Cir. 2002) .......... 7, 8

*Tennessee v. NCAA*,
718 F. Supp. 3d 756 (E.D. Tenn. 2024) .......... 8, 14

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) .......... 7

*United States v. Bertelsmann SE & Co. KGaA*,
646 F. Supp. 3d 1 (D.D.C. 2022) .......... 6

*Warner v. Gross*,
776 F.3d 721 (10th Cir. 2015) .......... 3

*Zeigler v. NCAA*,
No. 3:25-cv-226-KAC-JEM, 2025 WL 1671952 (E.D. Tenn. June 12, 2025) .......... 14

## I. INTRODUCTION

Before the ink was dry on this Court's injunction, and barely hours after it ruled on Defendant's motion to clarify, the NCAA filed this motion, demanding a stay so that it can continue to bar a certified class of fifth-year athletes from competing in the 2026–27 Division I season. At the same time, the NCAA issued a directive to its member schools, under the guise of "guidance," in which it creatively misinterprets this Court's orders while threatening its members to not sign certain Class Members. Specifically, it warned, "If a team elects to roster such student-athletes, the team's head coach will be suspended for 50% of the season and the athletic department will be fined." Shelquist Decl. Ex. A. Simultaneously, the NCAA also, apparently without informing this Court and in a clear bid to avoid its oversight, filed a motion to transfer this case to another court via the JPML process—representing to the JPML that this Court had not issued any orders despite docketing its papers after the injunction order on August 1.[1] Shelquist Decl. Ex. B–F. At the same time, it has used the existence of the Court's Injunctive Order in other actions as a basis for vacateur. Shelquist Decl. Ex. G. The NCAA continues to act as if it is above the law, including this Court's orders. But a proper reading of the law makes it clear: there is no basis to stay the injunction.

## II. BACKGROUND

On July 31, 2026, this Court certified a Rule 23(b)(2) class of Division I athletes who "began to play in collegiate sports in the 2022–2023 season" and "completed four years of eligibility . . . by the conclusion of the 2025–2026 season," ECF No. 37 at 17. It preliminarily

[1] Note that Defendants accurately represent the status of preliminary injunction briefings in other matters. *See* Shelquist Decl. Ex. D. The JPML papers are also procedurally suspect. The papers are dated July 31, but the first MDL docket entry is August 1. The affidavit of service claims some of the counsel in this case were served by email when they did not receive notice until after asking about the filing on August 3. *Compare* Shelquist Decl. Ex. F *with* Shelquist Decl. Ex. C; E.

enjoined the NCAA from implementing its Five-Year Eligibility Rule to bar those athletes from a fifth season, ECF No. 38 (the "Injunctive Order"). The Court addressed Plaintiffs' motion for a preliminary injunction, took the parties' evidentiary submissions—including declarations from Dr. David Berri and Dr. Matthew Backus—and resolved each preliminary-injunction factor on the record. ECF No. 38 at 2 n.1, 18–49. The NCAA then moved to clarify the injunction's scope. The Court granted that motion on August 2, and said the clarification "changes zero percent of the Court's substantive analysis." ECF No. 41 at 6 (the "Clarification Order"). The Court underscored that "the NCAA is enjoined from prohibiting Plaintiffs and Class Members from competing in a fifth season of collegiate athletics under the Rule (as defined in the preliminary injunction order) or any NCAA Bylaw." ECF No. 41 at 6. That same day, the NCAA noticed its appeal and filed this motion. ECF Nos. 42; 43.

The timing that made injunctive relief urgent makes a stay inappropriate. The Rule took effect August 1, 2026. ECF No. 38 at 5. Rosters are being set now, and NIL budgets are being committed now. *See* ECF No. 19-1 at 17. Class members, member schools, and coaches are already acting in reliance on the Court's orders—although they do so in the face of ongoing threats from the NCAA.

The NCAA has moved to stay the Court's injunction pending appeal and for an administrative stay "pending disposition of this motion, extending to at least 48 hours after the Court's ruling." Mot. at 1. The Court should decline both requests.

## III. LEGAL STANDARD

In determining whether a stay pending appeal of a preliminary injunction is warranted, this Court considers four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist.*, No. 1:24-cv-03512-CNS-STV, 2025 WL 1000774, at *1 (D. Colo. Apr. 3, 2025) (Sweeney, J.) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). The first two factors are "the most critical." *Nken*, 556 U.S. at 434. And "[a] motion for stay pending appeal is subject to the exact same standards" as a motion for a preliminary injunction. *Warner v. Gross*, 776 F.3d 721, 728 (10th Cir. 2015), *aff'd sub nom. Glossip v. Gross*, 576 U.S. 863 (2015). A stay "is not a matter of right, even if irreparable injury might otherwise result." *Nken*, 556 U.S. at 433 (citation omitted). It is an "intrusion into the ordinary processes of administration and judicial review." *Id.* at 427 (cleaned up).

The NCAA must make a strong showing that it is likely to prevail on appeal. It cannot. On review of a preliminary injunction the court of appeals "examine[s] the district court's legal determinations de novo, and its underlying factual findings for clear error." *Warner*, 776 F.3d at 728 (quoting *Citizens United v. Gessler*, 773 F.3d 200, 209 (10th Cir. 2014)). Because a stay motion is governed by "the exact same standards," *Warner*, 776 F.3d at 728, the NCAA must identify "a clearly erroneous factual finding or an error of law," *id.* It identifies neither.

## IV. ARGUMENT

### A. The NCAA Does Not Show It Is Likely to Succeed on Appeal

The NCAA's merits presentation has three parts. Each fails. First, it recasts *Christy Sports*—a pleading-stage Sherman Act Section 2 case about ski rentals at a Utah resort[2]—as blanket immunity for the timing of any rule change. This Court has already explained why

[2] *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188 (10th Cir. 2009).

that reading does not hold, ECF No. 38 at 42 n. 27, and the opinion itself forecloses it. Second, the NCAA asks the Tenth Circuit to reweigh competing expert declarations and to relabel this Court's factual findings as clear error, without identifying a single finding unsupported by the record. Third, it raises a factually-inapplicable indirect-effects theory for the first time, and it bases it on a decision that expressly declined to adopt any such rule. A movant who must show probable reversal cannot get there on a broadened misreading, a request to reweigh, and an argument it withheld.

1. <u>This Court's Analysis of Christy Sports Should Not Change</u>

This Court rejected the NCAA's reliance on *Christy Sports* in its Preliminary Injunction Order; Defendant has offered no basis for straying from that analysis. Plaintiffs have offered this Court analysis as to why *Christy Sports* is inapposite to this case. *See* ECF No. 35 at Section II.C.2. This Court also distinguished that case, finding that *Christy Sports*'s "recitation of basic antitrust principles, coupled with material procedural and factual distinctions, show how this argument stumbles out of the gate," and that the NCAA "fail[ed] to explain how a case decided against a different doctrinal backdrop, in a different procedural posture, and that concerned a distinguishable anticompetitive scheme" could defeat Plaintiffs' motion. ECF No. 38 at 42 n.27. That footnote is what the NCAA must show was an abuse of discretion. Instead, Defendant pairs its broadened reading with the assertion that Plaintiffs "Conceded That the Challenged Restraint Is Lawful." Mot. at 3. Plaintiffs conceded nothing of the kind. They did not challenge the NCAA adopting an age-based eligibility model; what they challenge is the membership's decision to withhold that from one cohort. *See* ECF No. 1 ¶ 10; ECF No. 19-1 at 15, 21; ECF No. 38 at 5. A plaintiff who does not challenge that a rule may be adopted does not also agree that it may be applied to everyone but themself.

The NCAA's tacked-on arguments about timing are also wrong. *Christy Sports* expressly preserved the timing claim the NCAA says it forecloses:

> We would not even preclude the theoretical possibility that such a change could give rise to an antitrust claim, for example, if by first inviting an investment and then disallowing the use of the investment the resort imposed costs on a competitor that had the effect of injuring competition in a relevant market. But there are no such allegations here.

555 F.3d at 1196. Here there are such allegations, and evidence behind them. Defendant has shown no reading that warrants this Court straying from its previous analysis of *Christy Sports*, and therefore its argument fails.[3]

2. Clear Error Review Forbids Reweighing Competing Declarations

The NCAA's remaining merits arguments do not claim legal error or claim clear factual error. On market definition, which "is a question of fact," *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 975 (10th Cir. 1990), the only authority the motion adds is *Blythe v. NCAA*, No. 26-01106, ECF No. 26 (9th Cir. Apr. 8, 2026), which was "vacat[ed] without opinion." Mot. at 6. An unexplained order resolving a different, and much weaker, record supplies no basis for reversal.[4] As for the published decisions, the Court thoroughly distinguished Plaintiffs' detailed presentation from the insufficient factual record presented in those cases. ECF No. 38 at 30–32.

The Court has also already considered and correctly rejected the NCAA's specific attack on Dr. Berri's data. *Compare* Mot. at 6–7 *with* ECF No. 38 at 29 n. 16. On Dr. Backus's

[3] To be clear, the Tenth Circuit never reached the question the NCAA now says it answered. Christy Sports, LLC abandoned its Section 1 claim on appeal, and the court said so: "now that the § 1 claim is no longer at issue and only § 2 claims remain, we need not address whether the restrictive covenant is a 'naked restraint.'" *Christy Sports*, 555 F.3d at 1199. A decision that declined to decide whether a restraint was unreasonable under Section 1 cannot supply a Section 1 immunity rule. ECF No. 38 at 42 n. 27.

[4] The record of *Blythe* confirms that the expert evidence offered in that case was in no way analogous to the level of detail provided by Dr. Berri in his analysis.

underclassmen critique, the Court found it was "itself suggestive" and supported by nothing more than "a chart from 'RealGM.com,'" and credited Dr. Berri's reply on this particular issue. *See* ECF No. 38 at 29–30; ECF No. 35-1 at ¶ 18–19. *Id.* at 29–30 (quoting ECF No. 35-1 ¶ 18). This Court has explicit purview over the weight it accords competing expert testimony. *See e.g. Obeslo v. Great-W. Life & Annuity Ins. Co.*, 6 F.4th 1135, 1148 (10th Cir. 2021) ("The district court has the exclusive function of appraising credibility, determining the weight to be given testimony, drawing inferences from facts established, and resolving conflicts in the evidence." (cleaned up)). The NCAA's opinion that its evidence was stronger comes nowhere close to meeting its burden of showing clear error.

The new evidence also answers the wrong question. Market definition here asks whether athletes can leave Division I for another buyer of their labor when D1 pays *less* or declines to allow their participation—not whether athletes arrive or stay in D1 when it pays *more*. *See, e.g., United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 34 (D.D.C. 2022) (buyer-side market definition considers "the alternatives available to sellers in the face of a decrease in the price paid" (cleaned up). It is the ability of college athletes to leave for another reasonably comparable buyer that would restrain the NCAA, but, as Dr. Berri's report establishes, "student-athletes have nowhere else to sell their labor." *NCAA v. Alston*, 594 U.S. 69, 90 (2021). As another court in the Tenth Circuit correctly notes,

> Post-*Alston*, [the fact] that the NCAA has monopsony power over the labor market for competitive student-athletes' services has only become more uncontestable, given the fact that NCAA Division I sports accounts for over 99% of NIL opportunities, and, as of July 1, 2025, NCAA members now compete to recruit athletes with *direct* compensation.

*Martinson v. NCAA*, 804 F. Supp. 3d 1109, 1125 (D. Nev. 2025), (appeal pending).[5]

The NCAA's remaining market-definition argument is one this Court has already resolved. Its motion says the market "rests on the supposition that different sports offerings at different schools are substitutes for each other—*e.g*. basketball for baseball." Mot. at 6. But that is a question about sellers, and this is a buyer-side case. The Court said so: "the proper focus is [on] the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers." ECF No. 38 at 26 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001)); *see also id.* at 22 n.13. Just as "[t]he question [in a buyer-side case] is not the interchangeability of, for example, lawyers with engineers," *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1135 (10th Cir. 2002), the question here is not the interchangeability of basketball players with baseball players. The question is whether a D1 athlete shut out of D1 has another reasonable substitute buyer for her labor. The Court took evidence on that question and answered it. ECF No. 38 at 31–33.

The premise fails on its own terms as well. This Court did not find that all Division I sports are interchangeable—it found the opposite, and said so in rejecting the same argument before: "Dr. Berri does not suggest all Division I sports are interchangeable. Instead, his declaration is evidence that for NCAA Division I sports the NCAA is the sole 'buyer' for all athletes in the 'submarkets' of individual sports." ECF No. 38 at 27. A market composed of submarkets is unremarkable. *See, e.g., Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1176 (10th Cir. 2023) ("Within the relevant market, there may be submarkets

[5] The NCAA's ability to irreparably harm Class members by excluding them from the market proves the point: they have nowhere else to sell their labor, meaning that Division I is a distinct labor market. As the NCAA touts, "98% . . . will go pro in something other than sports," ECF No. 38 at 32. That is because 98% of NCAA athletes have no reasonable substitute markets within which to sell their labor.

that are separate economic entities." (cleaned up). The Tenth Circuit affirmed this point over defendants' appeal that the relevant market was really hundreds of separate markets, because the district court's choice among competing expert submissions was not clear error. *Black*, 69 F.4th at 1177–78.

The NCAA also tells the Court that this market is "one that no court has ever accepted in the long history of NCAA antitrust litigation." Mot. at 6. Yet the order it asks this Court to stay cites one. ECF No. 38 at 31 (citing *Ohio v. NCAA*, 706 F. Supp. 3d 583, 592 (N.D. W. Va. 2023)).[6]

What the NCAA has never done, previously or here, is offer a market of its own. Dr. Backus conceded he did not conduct "a fulsome market definition analysis," ECF No. 32-3 ¶ 60. A party seeking a stay on the ground that the district court defined the wrong market must be prepared to say what the right one is. *See F.T.C. v. Butterworth Health Corp.*, 946 F.Supp. 1285 (W.D. Mich. 1996) (rejecting Defendants' argument where they had not even proposed an alternative market).

"[T]he definition of the relevant market rests on a determination of available substitutes," because the ability of labor market participants to turn to other buyers of labor restrains a firm from lowering prices below the competitive level. *Telecor Commc'ns, Inc.*, 305 F.3d, at 1130. Here, the record more than sufficiently established that very few NCAA Division I athletes have any opportunity to sell their labor elsewhere. The NCAA did not contest this; it merely nitpicked Dr. Berri's report. Accordingly, the Court did not err, much

[6] *See also Tennessee v. NCAA*, 718 F. Supp. 3d 756, 761–62 (E.D. Tenn. 2024) (identifying the market as "the market of Division I athletics").

less clearly so, in finding that Plaintiffs identified and sufficiently supported their claim that NCAA Division I constitutes a relevant labor market.

On anticompetitive effects, the Court found that the Rule will "reduce output, decrease wages, and decrease quality" in that market, on evidence that thousands of Division I roster spots sit below the applicable caps and that third-party NIL compensation is uncapped. ECF No. 38 at 34–36. So excluding qualified labor market participants will reduce the quantity of labor market participants and will reduce overall wages.[7]

On procompetitive rationale, the Court found that the NCAA offered none that antitrust law recognizes, because "reducing laborers in a market" is not procompetitive, *id.* at 38, and because the proffered equitable justification "bears little relevance in an antitrust inquiry," *id.* at 39 (citing *Alston*, 594 U.S. at 95).

And on less restrictive means, the Court found that the NCAA's own affiant had described the waiver machinery that would eliminate the harm, which defeated the NCAA's all-or-nothing premise. *Id.* at 43–44 (citing ECF No. 32-1 ¶ 15).

Each finding rests on evidence in the record. None is clearly erroneous, and the motion does not try to show otherwise.

3. Defendant's Indirect-Effects Theory is Unadopted and Inapplicable

For the first time, the NCAA argues that lost NIL earnings cannot support an antitrust claim because they are "indirect" effects of the eligibility rule. Mot. at 8–9. As an initial matter,

[7] The NCAA's supply-and-demand argument fails for the same reason, and the case it quotes says so. The Seventh Circuit did observe that "[u]nder ordinary principles of supply and demand, a restraint that limits the supply of workers in a labor market would increase, not decrease, worker compensation." But it finished the thought in the same breath: "[t]he Five-Year Rule may operate differently, but the record contains no evidence that would allow us to draw that conclusion." *Fourqurean v. NCAA*, 143 F.4th 859, 871 (7th Cir. 2025) (quoted at Mot. 8). That was a ruling about an empty record, not a rule of economics. This record is not empty, and this Court relied on it. *See* ECF No. 38 at 30–32.

the Court's finding of substantial anticompetitive effects did not rest solely on the importance of uncapped NIL earnings; it also found that the Rule will "reduce output . . . and decrease quality (*i.e*., the number of qualified, seasoned athletes) in the relevant market." ECF No. 38 at 36.

The NCAA's indirect-effects theory was not presented in Defendant's original opposition to Plaintiffs Motion. *See* ECF No. 32. And an argument the NCAA withheld from the district court is an argument it is unlikely to win on appeal.[8]

The authority Defendant cites also fails on its own terms. The NCAA leans on *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462 (6th Cir. 2005) (*NHLPA II*), and quotes the very sentence that defeats the argument: the Sixth Circuit "decline[d], in this case, to establish definitive rules regarding whether or when an anti-competitive injury that is only secondarily or indirectly caused by a defendant's alleged restraint on trade may ever support a viable claim under the Sherman Act." *Id.* at 475 (quoted at Mot. at 8). A court that declines to adopt a rule has not supplied one.[9]

Nor does the 2003 *Plymouth Whalers* decision carry the weight the NCAA gives it. *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712 (6th Cir. 2003) (*NHLPA I*), reversed a preliminary injunction because the plaintiffs failed to define

[8] This argument is particularly unlikely to prevail because it is a fact-bound argument, turning on whether uncapped NIL payments are direct or indirect results of NCAA eligibility determinations, and the record amply supports that reductions of uncapped NIL payments are direct—not indirect—effects of the Rule. *See, e.g.*, ECF No. 19-3 at ¶¶ 18–19 (NCAA controls the pay of college athletes), 50 ("wages" for college athletes include NIL); ECF No. 35-1 at ¶¶ 9–12 (same).

[9] The Tenth Circuit cases the NCAA adds are antitrust-standing decisions about who may sue, not about which effects count under the rule of reason. The NCAA has never challenged Plaintiffs' antitrust standing, and because Plaintiffs are sellers in the affected market, these cases do not help Defendant. *See Tal v. Hogan*, 453 F.3d 1244, 1258 (10th Cir. 2006) and *Comet Mech. Contractors, Inc. v. E. A. Cowen Const., Inc.*, 609 F.2d 404, 406–07 (10th Cir. 1980) (both finding plaintiffs lacked standing because they were neither "a buyer or seller in the affected market.").

any market at all: "[a]ppellees do not define a relevant market in their complaint," and the formulation the court worked from—"the market for competition among OHL and CHL teams for player services"—came from the district court's order. *Id.* at 720. That market definition failed because it was one that did not involve economic competition: players were paid solely in schooling and a limited stipend. *Id.* The Sixth Circuit's finding, reiterated here by Defendant, that "[h]arm to athletic competition is not a cognizable anti-competitive effect under the Sherman Act," *NHLPA II*, 419 F.3d at 473, is inapplicable to Division I athletics in 2026, it refers to the wholly different economic status of amateurism circa 2003. This Court's findings do not rest on the quality of the games themselves. They rest on reduced output, depressed wages, and the exclusion of a highly-qualified cohort of sellers for no valid procompetitive reason. ECF No. 38 at 36. Those are economic effects in an economic market.

**B. The NCAA Identifies No Irreparable Injury of Its Own.**

The second factor asks what irreparable harm the NCAA will suffer while its appeal proceeds. Upon review of the record, this Court found that "[f]undamentally, Plaintiffs face *irreparable* harm, and the NCAA *itself* faces challenges in administering Plaintiffs' relief and ensuring their eligibility for the upcoming season. There is no contest between the two, and they resolve in Plaintiffs' favor." ECF No. 38 at 48 (emphasis in original). A stay motion filed days later cannot manufacture the record the NCAA failed to initially build.

Not that the NCAA even tried. Its motion attaches no declaration, no exhibit, and no new evidence of any kind; it cites the existing record and the same Backus declaration this Court weighed and discounted.[10] This Court has seen the pattern before. Manufactured self-

[10] In support, the NCAA adds one additional article that states that "some girls in the [high school] Class of 2027 are bearing the brunt of the NCAA's latest ruling." An article published before the order cannot describe harm caused by the order, and the displacement it describes is displacement the NCAA created

injury is not a basis for the stay of an injunction. *See Crookshanks*, 2025 WL 1000774, at *5. The burden on the NCAA of not barring class members from competition is not an injury at all. The order requires the NCAA to *stop doing* something, not *to do* something. Its member schools can simply allow class members to compete, and the NCAA is capable of instituting an administrative waiver process if it chooses to do so. *See* ECF No. 46 at Section IV.A.

As for the "roster chaos" theory, it rests on the same zero sum premise this Court rejected on the evidence. *See* ECF No. 38 at 34–35. Roster limits are a product of the NCAA's own rulemaking, and this Court's order leaves that rulemaking untouched. ECF No. 41 at 5. The NCAA could choose to raise roster limits to the extent necessary to absorb this cohort. The theory also cuts against the NCAA on timing: rosters finalize now, in August. It is the stay—not the injunction—that would work the irreversible change.

The arithmetic argument the NCAA builds from Plaintiffs' own evidence does not establish harm to the NCAA either. The class is one enrollment cohort—those who began collegiate competition in 2022–23, competed in Division I, and completed four years of eligibility by the end of 2025–26. ECF No. 37 at 17. In building its analysis of class size the NCAA rests on Plaintiffs' own analysis of open roster spots, despite stating earlier that there is "no evidence in the record that schools have many open roster spots in the current season," Mot. at 12. That the class is not fully determined does not somehow create irreparable harm, and no evidence negates the availability of spots. *See e.g.*, ECF No. 46-1 at ¶ 6. Such argument fails on its face; no irreversible harm to the NCAA has been shown.

---

through its Rule. Mot at 11. The assertion that harms "began to occur within hours of the Court's decision," Mot. at 1, rests on displacement the NCAA was content to inflict by the Rule itself, not the Court's order.

### C. A Stay Would Inflict on the Class the Very Injury This Court Has Already Found Irreparable.

The third factor is not close. This Court found that class members face the "loss of a season" that cannot be "compensated after the fact by money damages," ECF No. 38 at 46 (citation modified), joining every court to consider the question, *see id*. at 45–46. *Biediger* answers the NCAA's stay theory directly: the ability to "transfer to other Division I schools after next year," together with honored scholarships, "does not protect the plaintiffs from irreparable harm." *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009).[11]

Reliance interests now run in the class's favor. The NCAA built its opposition around the "settled expectations" of athletes who planned their seasons on existing rules, ECF No. 32 at 2, 7, and closed by urging that before the Court "disrupts the experience and settled expectations of all other student-athletes and creates chaos in the 2026-27 season, it should insist on economic evidence that meets the elements of an antitrust case," *id*. at 21. The class provided that evidence, and those arguments now rightly condemn the NCAA's own motion. Since July 31, class members, coaches, and schools have been acting on this Court's orders—rejoining rosters, allocating NIL budgets, planning seasons. Suspending the injunction now would unsettle a court-ordered status quo in exactly the way the NCAA told this Court was intolerable.

### D. The Public Interest Favors Antitrust Enforcement and Stability

This Court found the public interest satisfied because "ensuring the NCAA's compliance with federal antitrust law will serve the public interest." ECF No. 38 at 49; see

[11] The Tenth Circuit has made a comparable observation, holding that where a continuing violation "operates to deprive plaintiffs of the opportunity to play" their sport, "monetary relief alone is inadequate." ECF No. 38 at 46 (citing *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 833 (10th Cir. 1993)).

*Tennessee v. NCAA*, 718 F. Supp. 3d 756, 766 (E.D. Tenn. 2024); *Ohio*, 706 F. Supp. 3d at 600. The NCAA's two new district-court cases do not move the needle. *Zeigler v. NCAA*, No. 3:25-cv-226-KAC-JEM, 2025 WL 1671952 (E.D. Tenn. June 12, 2025), and *Coley v. NCAA*, 792 F. Supp. 3d 634 (E.D.N.C. 2025), Mot. at 14, each denied relief to a single athlete on a record that lacked market-wide proof of the market the plaintiff had pleaded. In *Zeigler*, the plaintiff's economist "did not analyze that market" and "did not specifically study NIL compensation—the other side of the economic equation." *Zeigler*, 2025 WL 1671952, at *2. In *Coley*, the plaintiff's expert declaration arrived on reply, and the court disregarded it on procedural grounds while acknowledging that it "could have supported Coley's burden . . . had Coley included [it] with his initial memorandum." *Coley*, 792 F. Supp. 3d at 647. That is why this Court cited *Coley* for the distinction it drew: the plaintiff there "did not offer any expert economic analyses or provide any market-wide data for the court's consideration." ECF No. 38 at 36 n.22 (quoting *Coley*, 792 F. Supp. 3d at 647). And the roster-displacement passage the NCAA quotes from *Zeigler* rests entirely on a declaration from the same expert whose zero sum premise this Court rejected on the evidence here.[12] *Zeigler*, 2025 WL 1671952, at *5; ECF No. 38 at 34–35.

The NCAA barely contested this factor below—its public-interest argument was "limited to a header in its brief." ECF No. 38 at 49. The NCAA now says that "the public interest favors promoting competition and consumer choice in collegiate athletics." Mot. at 15. Plaintiffs concur with this plain language; but the NCAA casts itself as the guardian of that interest, and of college athletes' interests, while asking to suspend an order requiring it to

[12] The *Braham* court additionally rejected this fixed-roster premise for want of evidence. *Braham v. NCAA*, 794 F. Supp. 3d 824, 839 (D. Nev. 2025) (appeal pending).

comply with the antitrust laws. This Court has now found that the NCAA is likely using its monopsony to exclude an entire cohort from the market in violation of the antitrust laws. ECF No. 38 at 33–40. A monopsonist asking for permission to keep doing what a court has found to likely be unlawful is not advancing competition or consumer choice. It is asking the public to continue to endure its unlawful conduct.

The NCAA's framing of the interest at stake makes the point. It argues the public benefits from preserving its "ability to govern collegiate athletics based on the collective expertise of the leaders of the Nation's institutions of higher education, rather than a small group of attorneys," Mot. at 2, and from freedom "from judicial micromanagement," Mot. at 15. But a group of competing employers agreeing among themselves to exclude one cohort of workers is not governance the public has an interest in preserving. It is the very conduct the Sherman Act exists to prohibit. *See Alston*, 594 U.S. at 94–95.

### E. An Administrative Stay Would Inflict the Harm the Injunction Prevents

The NCAA separately asks for an administrative stay running through 48 hours after this Court rules. Mot. at 1. That request fails on its own terms. An administrative stay preserves the status quo while a court deliberates. This one would reverse it.

## V. CONCLUSION

The Court should deny the NCAA's motion for an administrative stay and its motion to stay the preliminary injunction pending appeal.

DATED: August 6, 2026

*/s/ Robert K. Shelquist*
Robert K. Shelquist
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
5775 Wayzata Blvd., Suite 6220
St. Louis Park, MN 55416
Telephone: 202-789-3960
rshelquist@cuneolaw.com

Christian Hudson
Alexandra Klein
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
222 Livingston Street, Unit 2
Brooklyn, NY 11201
Telephone: 202-789-3960
christian@cuneolaw.com
aklein@cuneolaw.com

Michael J. Flannery
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
Two CityPlace Drive
St. Louis, MO 63141
Telephone: (314) 330-2771
mflannery@cuneolaw.com

Daniel Cohen
Alexandra Warren
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
2445 M Street NW, Ste. 740
Washington, D.C. 20037
Telephone: 202-789-3960
awarren@cuneolaw.com
danielc@cuneolaw.com

Elliot S. Abrams
**CHESHIRE PARKER SCHNEIDER & ABRAMS, PLLC**
133 Fayetteville Street, 4th Floor
P.O. Box 1029
Raleigh, NC 27602
Telephone: 919-833-3114
Facsimile: 919-832-07739

elliot.abrams@cheshirepark.com

J. Barton Goplerud*
**SHINDLER, ANDERSON, GOPLERUD & WEESE, P.C.**
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265
Telephone: 515-223-4567
Facsimile: 515-223-8887
goplerud@saglaw.com

C. Peter Goplerud III
**NATIONAL LITIGATION LAW GROUP**
401 W. Broadway Ave.
Enid, OK 73701
Telephone: 904-502-9515
pgoplerud@nationlit.com

Robert A. Boland
Diana Florence
**SHUMAKER, LOOP & KENDRICK, LLP**
1000 Jackson Street
Toledo, OH 43604
rboland@shumaker.com
dflorence@shumaker.com

Bruce L. Braley
Alex R. Wilschke
Brian N. Aleinikoff
Adrian G. Johnson
**LEVENTHAL PUGA BRALEY P.C.**
950 S. Cherry St, Suite 600
Denver, CO 8026
Telephone: 303-759-9945
Facsimile: 303-759-9692
bbraley@leventhal-law.com
awilschke@leventhal-law.com
brian@leventhal-law.com
ajohnson@leventhal-law.com

***Counsel for Plaintiffs and the Proposed Class***
* *to be admitted.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 6, 2026, I caused the foregoing document, **PLAINTIFFS' OPPOSITION TO DEFENDANT'S EMERGENCY MOTION FOR ADMINISTRATIVE STAY AND MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL**, to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ *Robert K. Shelquist*
CUNEO GILBERT FLANNERY & LADUCA, LLP